### M. WITMARK & SONS v. JENSEN.

### SANTLEY–JOY, Inc. v. HASTINGS THEATRE CORPORATION.

### HARMS, Inc. v. GRAND THEATRE CORPORATION.

### M. WITMARK & SONS et al. v. BERGER AMUSEMENT CO., Inc.

Civ. Nos. 1026, 1797, 1798, 1799.

United States District Court
D. Minnesota, Fourth Division.

Sept. 9, 1948.

Louis D. Frohlich, of New York City, and Thomas Vennum, of Minneapolis, Minn., for plaintiffs.

Louis B. Schwartz and Samuel P. Halpern, both of Minneapolis, Minn., for defendants.

Bogle, Bogle & Gates, of Seattle, Wash., amicus curiæ.

NORDBYE, Chief Judge.

Plaintiffs in these cases are seeking (1) damages for alleged infringement by defendants of certain musical composition copyrights owned by plaintiffs, and (2) an injunction restraining future threatened violation of those copyrights. Plaintiffs contend that defendants, who operate certain motion picture theatres, gave public performance of those compositions for profit when showing certain films in their theatres without first obtaining from plaintiffs a license to perform publicly the compositions for profit.

Defendants contend that plaintiffs are entitled to no relief upon the grounds that (1) plaintiffs have illegally extended their copyrights, and (2) plaintiffs' method of doing business is in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. Unless these defenses can be sustained, it follows from the evidence that plaintiffs have established infringement of the musical copyrights referred to in the complaint and are entitled to an injunction, damages, and counsel fees.

Plaintiffs are members of the American Society of Composers, Authors and Publishers, better known as Ascap, which is a voluntary association including within its membership many composers, authors, and publishers of musical compositions. Motion pictures in the United States are produced principally by eight major companies and are licensed by the producers to exhibitors to be exhibited in various motion picture theatres. Sound for pictures cannot be played unless the music included in the sound track is also played, in that the dialogue and music are on the same sound track and obviously cannot be separated. Plaintiffs and the other members of Ascap have adopted by their arrangements, agreements, and practices a uniform plan whereby copyright music owned by them is licensed through an agent to motion picture producers. The music is licensed to them at a license fee agreed upon, permitting the producers to synchronize the copyrighted music on the sound track of the motion picture film to be produced. The music by such synchronization will be integrated with the film, and all the members of Ascap know and are informed that the film on which the music is recorded will be copyrighted by the motion picture producer and thereafter licensed for exhibition in motion picture theatres for profit throughout the United States and elsewhere. As stated, the rights granted to the motion picture producers are merely synchronization rights. The license agreements covering synchronization seem to vary in form, but all of them specifically indicate that the rights granted are recording rights alone and do not extend to performance rights of the copyrighted music. In some the following reservations are made: "The right to perform said musical composition as covered by this agreement is conditioned upon the performance of said musical composition in theatres having valid licenses from the American Society of Composers, Authors and Publishers, or any other performing rights society having jurisdiction in the territory in which said musical com-

position is performed." In other license contracts, the word "perform", as noted in the first line, is changed to the word "record". There may be other changes in the wording in the various forms of contracts used.

Furthermore, it may be noted that, in the agreements between the copyright owner and the producers granting synchronization rights to the producers, the latter specifically assent that there is a reservation to the copyright owner of the right to license the performance rights to the exhibitors of the films, and, in carrying out the arrangement between the copyright owner and the producer, the latter in its contract with the theatre owner limits the exhibition of the film, where Ascap rights are involved, to theatres having licenses from Ascap.

The licensing of the performance rights of the copyrighted music thus recorded on the sound film is handled exclusively by Ascap for these plaintiffs and other members of that Society. There are some fifteen thousand theatres in the United States which obtain music performance rights from Ascap. The performance rights of any musical composition controlled by Ascap may be licensed singly, but it appears that Ascap's copyrighted music is always licensed as a group under a blanket license from Ascap. And while the copyright owners, including the plaintiffs herein, since the consent decree entered into in 1941 between Ascap and the Federal Government, may deal individually with anyone seeking a license for the performance of their compositions publicly for profit, it seems that, in the licensing of the performance rights of the music integrated in a sound film, as a matter of practice theatre owners have but little opportunity to obtain licenses from the many individual copyright owners belonging to Ascap who may have copyrighted music in the particular film purchased by the theatre owner. Defendants term the right of granting individual licenses by the individual Ascap copyright owner as "illusory" in that the motion picture theatre owner is generally required to buy his pictures for his theatre before he knows what copyrighted music may be contained therein. It is contended that often he does not know the titles of the pictures for which he has contracted and which he has agreed to exhibit in his theatre. The "cue sheets", which contain the entire music score of the particular film and which are made available with each film production, reflect whether the music is copyrighted or in the public domain, but usually they are not made available to the exhibitor until he has bound himself to purchase the film. Obviously, therefore, it is urged that he is in no position to bargain for a license with the copyright owners of the music. That is, he must have the license or licenses or he cannot exhibit the film in his theatre. Defendants contend that, in the relatively short time available to the motion picture operator after the cue sheets are available, it would be quite impossible for any motion picture exhibitor to contact all the different copyright owners of music for licenses, and that the very predicament that he would be in if he would assume to wait until the cue sheets are prepared and made available before he bargained for a license for copyright music requires him to obtain a yearly blanket license for all Ascap music if he is to carry on his theatre business successfully. That the necessities of the situation seem to make this practice uniform is sustained by the record herein, and there is no deviation in the manner in which theatre owners obtain a license for the performance rights of copyrighted music. They all clear through Ascap, and for years Ascap has built up its business in this regard accordingly and with full knowledge of all of these circumstances. In fact, one of the witnesses, informed as to the methods of doing business in this regard, testified, and his testimony is not contradicted, that he had never heard of any theatre owner's approaching anyone but Ascap for performance rights where the music was copyrighted by an Ascap member. Then, in addition, there are certain practical aspects which undoubtedly have brought about the uniform practices of Ascap in this regard. If a member of Ascap intends to issue a performance license to a motion picture theatre owner, he is required to give notice to the Society of his intention to do so, and the issuance of such license by him must have the approval of all parties interested in the copy-

right—the composer, the author, and the publisher. All license fees obtained by Ascap members for performance of motion picture films for profit are paid to Ascap and these fees are distributed to the members by Ascap according to a formula devised by that Society. These factors undoubtedly have had a bearing upon, and apparently were devised to bring about, the plan of Ascap's being in exclusive control of the granting of performance rights of music copyrighted by Ascap.members, but whatever may have occasioned the plan, it is evident that Ascap has obtained over the years a monopoly of the music thus integrated in sound motion picture films. It is uncontradicted that on an average at least 80% of the music integrated in sound films is copyrighted and owned by members of Ascap and the licensing exclusively controlled by Ascap.·

This plan and method of doing business by plaintiffs and the other members of Ascap undoubtedly was prompted by a desire to protect their rights as copyright owners, facilitate the collection of license fees so that they might be distributed in accordance with the formula agreed upon, enable them to handle more expeditiously the licensing of films to theatre owners, and enable the Society to police the violations of their copyrights. But, notwithstanding these seeming beneficent purposes, plaintiffs and their associates through Ascap have obtained by these methods and practices which they have carried on over the years monopolistic control over the copyrighted films in which their music is integrated. This seems evident because, unless the theatre owner obtains a license at a fee which plaintiffs and their associates through Ascap demand, no theatre owner can exhibit a sound film which he rents from a producer and which contains Ascap music. In other words, plaintiffs and their associates have, through Ascap, the combined and potential power to deny to any theatre owner the right to carry on his business, because, without the right to exhibit films containing Ascap music, no theatre owner would be able to stay in business. It is therefore defendants' contention that all of these facts and circumstances undeniably establish that plaintiffs have extended their copyrights by their method of doing business and that such practices give to them through Ascap an economic advantage and economic control beyond that granted to each of them by the copyright laws. Defendants rely principally upon the teachings of the following cases: Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416; 61 L.Ed. 871, L.R.A. 1917 E, 1187, Ann.Cas. 1918 A, 959; Carbice Co. v. American Patents Development Co., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 88. L.Ed. 376; Mercoid Corporation v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396; Ethyl Gas Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416.

Questions similar to those presented herein were before this Court on defendants' motion for a summary judgment. That motion was denied on July 10, 1947. However, further consideration of the facts now disclosed in the record and a reappraisal of some of the decisions of the Supreme Court has caused the Court to depart from the principal conclusions reached in passing upon defendants' motions.

■ At the outset, it may be assumed that a copyright owner of music may have the right to license the recording of his composition on a film and also the exclusive right to license the performance of the synchronized composition publicly for profit. It would seem that these rights are separate and independent rights under the Copyright Act, which provides, 17 U.S.C.A. § 1:

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work;

\*   \*   \*   \*   \*   \*

"(e) To perform the copyrighted work publicly for profit if it be a musical compo-

sition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: * * *."

The United States Court of Appeals for this circuit has held in Remick Music Corp. v. Interstate Hotel Co., 1946, 157 F.2d 744, at page 745, certiorari denied, 329 U.S. 809, 67 S.Ct. 622, 623, 91 L.Ed. 691, 1296, that the right to perform a composition publicly for profit and the right to record it are separate and independent rights. See, also, Jerome v. Twentieth Century Fox-Film Corp., D.C., 67 F.Supp. 736; Buck v. Jewell-LaSalle Realty Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971, 76 A.L.R. 1266; Jewell-LaSalle Realty Co. v. Buck, 283 U.S. 202, 204, 51 St.Ct. 407, 75 L.Ed. 978; Buck v. Swanson, D.C., 33 F.Supp. 377, 387, and cases cited; Fox Film Corporation v. Doyal, 286 U.S. 123, 127, 52 S.Ct. 546, 76 L.Ed. 1010.

And because of the claimed right to split the licensing of the recording rights and performance rights, plaintiffs urge that the asserted extension of their copyrights is merely the copyright monopoly which has inured to them because of the advancement in the motion picture industry, which has inaugurated sound films and devised the technique of integrating the sound script with the background of music and songs. It is pointed out that any individual copyright owner of music necessarily obtains a potential control over motion picture films if a producer decides to use his music in a sound film; that is, no motion picture exhibitor can exhibit any film containing copyrighted music unless he pays tribute by way of a license fee to every copyright owner of music which may be contained in the film. Thus, it is argued that the potential power of the copyright owner over the copyrighted film, and perchance any uncopyrighted songs contained in the film, is the result of the monopoly granted by the copyright law and is thrust upon the copyright owner by reason of the mechanical arts and technique employed in the pro-

duction of the sound motion pictures. But if it be assumed that the act of an individual copyright owner in granting an individual recording license of his copyrighted music to the motion picture producer, and the granting of performance rights to the motion picture exhibitor, does not unlawfully extend his copyright monopoly, that situation is not that which the present record presents. Here, the plaintiffs and their associates have wittingly or unwittingly adopted a method and plan of licensing the recording for public performance of their copyrighted music in the motion picture field which has bestowed upon them a monopoly of some 80% of all of the music recorded in motion picture films. By placing the control of performance rights for motion pictures in a Society maintained by them, they have obtained a potential economic advantage which far exceeds that enjoyed by one copyright owner. The power, although it may be argued it has been benevolently exercised in the past, nevertheless fully exists. Through Ascap, these plaintiffs and their associates by a refusal to license, or by the imposition of an exorbitant performance license fee, can sound the death knell of every motion picture theatre in America. That it would not be good business economics for them to do so does not mitigate the economic advantage which these plaintiffs have obtained in addition to that which is granted to them by their lawful copyright monopoly. Free competition among the members of Ascap to license individually their music is effectively curbed, if not completely obliterated, by the scheme of operation which the members of Ascap have adopted. The monopoly which they enjoy is tied in with the copyrighted film monopoly because, as a part of the plan, the producers require the exhibitors to obtain a license from Ascap where Ascap's music is involved before they are authorized to exhibit the film which is licensed to them. The pooling of all license fees obtained from the licensing of some 80% of all sound music in motion pictures and the sharing of the revenues thus obtained permit each copyright owner to enjoy the benefits obtained by other copyright owners. So it will be seen that plaintiffs have also tied their copyrights with

other copyrighted music and thus have shared in the rewards which are obtained from other copyrighted material.

The language used by Judge Hand in speaking for the three-judge court in United States v. Paramount Pictures, Inc., D.C., 66 F.Supp. 323, at page 348, seems apposite. There, the court was considering the monopoly of motion picture producers in carrying on their practice of "block booking" in the sale of films to motion picture exhibitors. Judge Hand stated: "It is true that a copyrighted motion picture when united with another copyrighted picture by block-booking is not tied to an uncopyrighted article. Nevertheless the objections to conditioning the licensing of one picture upon the licensing of another are the same, for the result is to give the copyright owner not only the reward which is his due from the licensing of a single copyrighted film, but to extend his monopoly by requiring his licensee to accept one or more other films and to pay royalties therefor as an additional consideration."

Instead, therefore, of having a single monopoly of a particular piece of copyrighted music and the benefits which that might afford, every copyright owner of music in Ascap obtains the added economic power and benefit which the combined Ascap control gives to them and their associates. Obviously, no one copyright owner would have the monopolistic power over the motion picture industry which Ascap now enjoys.

It does not appear that plaintiffs or Ascap have actually imposed exorbitant fees in the past, or that they have ever refused to license any theatre owner who is willing to pay the required fee. And while it does appear that Warner Brothers, Metro-Goldwyn-Mayer, Paramount, and Twentieth Century Fox, four of the major motion picture producers, have subsidiaries which are members of Ascap, and that these producers have employees and others who compose music for films for them and that such music is copyrighted by the producers or their affiliates and eventually licensed by Ascap in the same way as music composed and copyrighted by other composers belonging to Ascap, and that these producers thereby share in the license fee pool maintained by Ascap, it does not seem necessary to determine on this record whether there is any actual conspiracy between the major producers, or a majority of them, to combine with Ascap in its plan of splitting the license rights in order to create a greater revenue for Ascap and for the producers. It may be that the producers are of the opinion that it is simpler to have the exhibitors pay the performance license fee rather than for them to pay Ascap a license fee for both recording and performance, and then pass on the extra cost of the license fee to the exhibitors. Admittedly, however, there may be an economic advantage to both the producer and Ascap under the present system.

However free plaintiffs and their associates in Ascap may have been from any design or intent to extend their copyright monopoly, or however beneficial it may be for them to carry on their business in this manner, or however inconvenient it may be for them to function otherwise; such facts and circumstances will not permit them to enlarge their lawful monopoly. As stated by the Supreme Court in B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. 367, "* * * The patent monopoly is not enlarged by reason of the fact that it would be more convenient to the patentee to have it so, or because he cannot avail himself of its benefits within the limits of the grant." And as stated in Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 666, 64 S.Ct. 268, 271, 88 L.Ed. 376, "* * * The necessities or convenience of the patentee do not justify any use of the monopoly of the patent to create another monopoly. The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use."

It is the collective acts and agreements of plaintiffs and their associate members which have diverted their copyrights from their "statutory purpose and become a ready instrument for economic control in domains where the anti-trust acts or other laws not the patent statutes define the public policy." Mercoid Corporation v. Mid-Continent Inv. Co., supra, 320 U.S. at page 666, 64 S.Ct. at page 271. Refuge cannot

be sought in the copyright monopoly which was not granted to enable plaintiffs to set up another monopoly, nor to enable the copyright owners to tie a lawful monopoly with an unlawful monopoly and thus reap the benefits of both.

The defendants contend that plaintiffs not only are extending their copyright monopoly in contravention of the copyright law, but also are violating the anti-trust laws and that, for both of these reasons, they should be precluded from any recovery or injunctive relief herein because the relief they are seeking is in effect in furtherance and in aid of their law violations. In a recent decision of Judge Leibell, of the Southern District of New York, in Alden-Rochelle, Inc., et al. v. American Society of Composers, Authors and Publishers et al., 79 F.Supp. 315, 320, Ascap was held, upon the facts presented in that case, to be in violation of the anti-trust laws. While some of the facts recounted in that decision may not very clearly appear in the record herein, it would seem that a fair appraisal of this record would require the same conclusions as indicated by Judge Leibell. He determined that "Almost every part of the Ascap structure, almost all of Ascap's activities in licensing motion picture theatres, involve a violation of the anti-trust laws." In passing, it may be noted that the consent decree of 1941 permitting individual copyright owners to issue individual licenses for performance rights does not preclude a finding that Ascap is in violation of the anti-trust laws in other respects.

As heretofore indicated, motion picture operators are required by the methods of doing business established by the producers, as well as by the members of Ascap, to enter into a blanket license with Ascap for the performance rights of the copyrighted music integrated in sound films, and, as stated, Ascap under this arrangement controls some 80% of the music integrated in sound films. It seems undeniable that there is no competition among Ascap members. Competition is effectually restrained because all licenses are granted by Ascap under its control and domination. All earnings derived from licenses are pooled and divided among the members. As illustra-

tive of the monopoly and control of Ascap, it appears that in August, 1947, it attempted by a notice to all theatre owners, to raise substantially and arbitrarily the license fees for performance rights of Ascap music in all motion picture theatres in the United States. This proposed raise was to be based upon the seating capacity and the admission charge of the particular theatre. Thereafter, the representatives of Ascap and representatives of a certain portion of the motion picture exhibitor associations had long negotiations looking to an adjustment in the existing rates for the right to perform publicly for profit music in Ascap's repertoire by the motion picture exhibitors throughout the United States. And while it is contended that the present rates arrived at in February, 1948, were acquiesced in by some twelve thousand motion picture exhibitors as being fair and reasonable and that they were willing to execute contracts with Ascap thereunder, the price fixing power was nevertheless vested in Ascap. The reasonableness or unreasonableness of the rates does not militate against the absolute control of Ascap to fix prices. The vice of the arrangement is apparent because, as the Supreme Court stated in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129,

" * * * the machinery employed by a combination for price-fixing is immaterial.

"Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se."

It cannot be denied, therefore, that plaintiffs and their associates, acting in concert through Ascap, fix prices and completely control competition and thereby restrained trade in violation of Section 1 of the Sherman Anti-Trust Act which declares illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." Moreover, it seems inescapable on this record that plaintiffs, through Ascap, have achieved monopolistic domination of the music integrated in the sound films in the motion picture industry

and have effectively monopolized that part of trade and commerce in violation of Section 2 of the Sherman Anti-Trust Act. As stated by Judge Leibell in his decision: "The fact that Ascap is a membership association gives it no immunity. 'Arrangements or combinations designed to stifle competition cannot be immunized by adopting a membership device accomplishing that purpose'. Associated Press v. United States, 326 U.S. 1, at page 19, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013. Nor is Ascap shielded by its purpose to prevent the infringement of the copyright of its members. The purpose of the Fashion Guild to prevent 'style piracy,' i. e. the copying of 'original creations,' did not take it outside the scope of the anti-trust laws. Fashion [Originators] Guild v. [Federal] Trade Comm., 312 U.S. 457, [668], 61 S.Ct. 703, 85 L.Ed. 949."

Granted that there may be practical difficulties confronting Ascap members if they are to realize a full reward of their individual copyright monopoly, their practice of using a monopoly to obtain another monopoly cannot be condoned in view of the prohibition of the anti-trust laws. The language of Mr. Justice Reed in United States v. Line Material Co., 333 U.S. 287, 315, 68 S.Ct. 550, 564, seems highly pertinent: " * * * The mere fact that a patentee uses his patent as whole or part consideration in a contract by which he and another or other patentees in the same patent field arrange for the practice of any patent involved in such a way that royalties or other earnings or benefits from the patent or patents are shared among the patentees, parties to the agreement, subjects that contract to the prohibitions of the Sherman Act whenever the selling price, for things produced under a patent involved, is fixed by the contract or a license, authorized by the contract."

Undoubtedly, the simplest plan for the copyright owners belonging to Ascap would be for them to issue both synchronization rights and performance rights to the producers. This would provide for a free competitive market in the motion picture industry for all copyright owners of music suitable for use in sound films. That the cost of the performance license would be passed on to the theatre owner is entirely probable, but plaintiffs would not be using their copyright privileges contrary to public interest.

In view of the foregoing, if the relief sought by the plaintiffs were granted, the Court would be, as stated in Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, at page 670, 64 S.Ct. 268, 273, 88 L.Ed. 376, "placing its imprimatur on a scheme which involves a misuse of the patent privilege and a violation of the anti-trust laws." The same principle is announced in Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, at page 492, 62 S.Ct. 402, 405, 86 L.Ed. 363, where the court stated, "It is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest."

This Court is now sitting as a court of equity. Equitable relief is prayed for to restrain the defendants from future threatened violation of plaintiffs' copyrights, as well as for damages for past infringement. Public interest transcends plaintiffs' rights under their copyrights, and where the granting of the relief sought would serve to continue the unlawful practices here condemned, it should be withheld. One who unlawfully exceeds his copyright monopoly and violates the anti-trust laws is not outside the pale of the law, but where the Court's aid is requested, as noted herein, and the granting thereof would tend to serve the plaintiffs in their plan and scheme with other members of Ascap to extend their copyrights in a monopolistic control beyond their proper scope, it should be denied. In view of the Court's finding that the copyright monopoly has been extended, it is not necessary to determine whether anti-trust violations alone would deprive plaintiffs of the right of recovery. See article "Violations of Anti-Trust Laws as Defenses in Civil Actions," Minnesota Law Review, May, 1947.

It follows, therefore, from the premises that plaintiffs should be denied any recovery herein. Findings of fact and conclusions of law consistent herewith may be submitted upon five days' notice.

An exception is allowed to the plaintiffs.