**UNITED STATES of America,**
**Plaintiff,**

**v.**

**AMERICAN SOCIETY OF COMPOSERS,**
**AUTHORS AND PUBLISHERS,**
**Defendant-Appellee.**

**Application of SHENANDOAH VALLEY**
**BROADCASTING, INC., et al.,**
**Petitioners-Appellants.**

**No. 402, Docket 28086.**

United States Court of Appeals
Second Circuit.

Argued March 30, 1964.

Decided April 14, 1964.

Certiorari Denied June 22, 1964.
See 84 S.Ct. 1917.

Walter R. Mansfield, Donovan, Leisure, Newton & Irvine, New York City, for petitioners-appellants.

Arthur H. Dean, New York City (William Piel, Jr., Herman Finkelstein, New York City, Lloyd N. Cutler, of Wilmer, Cutler & Pickering, Washington, D. C., and Frederick A. Terry, Jr., of Sullivan & Cromwell, New York City, of counsel), for defendant-appellee.

Before MOORE, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

### I.

A year ago we dismissed this appeal because of what we considered to be "the controlling force of the Expediting Act [32 Stat. 823 (1903)] in routing all ap-

peals from final judgments [in actions by the Government under the antitrust laws] to the Supreme Court . . . "; 2 Cir., 317 F.2d 90, 94 (1963), a construction which we thought to follow from the language of the statute and from decisions applying it such as Terminal R.R. Ass'n v. United States, 266 U.S. 17, 45 S. Ct. 5, 69 L.Ed. 150 (1924); United States v. California Co-op. Canneries, 279 U.S. 553, 558–559, 49 S.Ct. 423, 73 L.Ed. 838 (1929); United States Alkali Export Ass'n v. United States, 325 U.S. 196, 201–202, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945); and De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 217, 65 S. Ct. 1130, 89 L.Ed. 1566 (1945). As our opinion indicated, we were troubled by the fact that although the order of the District Court dismissing appellants' application seemed indeed to be "final" so far as this action was concerned, the Supreme Court, without explanation and over Mr. Justice Black's dissent, had dismissed the appeal that appellants had taken to it, 371 U.S. 540, 83 S.Ct. 519, 9 L.Ed.2d 508 (1963). We thought this might have been founded on special principles relating to applications by persons not parties to the action, dismissal of whose claims for relief therein would leave them free to pursue other remedies, and that in any event denial of jurisdiction by the Supreme Court, for whatever reason, did not give us a role under a statute from whose scheme we considered the courts of appeals to have been excluded. On appellants' petition for certiorari, the Supreme Court summarily reversed, 375 U.S. 39, 84 S.Ct. 8, 11 L.Ed. 2d 8 (1963), explaining *per curiam* that its dismissal of the appeal that had been taken to it had been based on an "unexpressed view" that the Expediting Act was subject to an unexpressed exception with respect to a controversy which, as was deemed the case here, "is entirely between private parties and is outside the main stream of the litigation in which the Government is directly concerned."[1] Appeals to the courts of ap-

---

1. The Court referred with a "Compare" to Terminal R. R. Ass'n v. United States, 266 U.S. 17, 45 S.Ct. 5, 69 L.Ed. 150 (1924), and Aluminum Co. of America v.

peals from final orders in such controversies were held to lie under 28 U.S.C. § 1291.

The Supreme Court's description of the exception which it found implicit in the Expediting Act created a further problem of appellate jurisdiction. Before taking their appeals to the Supreme Court and to this court, appellants waited 58 days after the entry of judgment in the District Court, relying as to the latter on the provisions of 28 U.S.C. § 2107 and F.R.Civ.Proc. 73(a) allowing 60 days from the entry of judgment for all parties to appeal "in any action in which the United States or an officer or agency thereof is a party." In view of the Supreme Court's characterization of the instant controversy as "entirely between private parties," which appellee thought to raise a question as to the timeliness of the appeal to this court, it petitioned the Supreme Court for rehearing and obtained a modification of the *per curiam* opinion so that the cause, instead of being "remanded to the Court of Appeals for consideration on its merits," as originally ordered, was "remanded to the Court of Appeals for further proceedings in conformity with this opinion," 375 U. S. 994, 84 S.Ct. 627, 11 L.Ed.2d 467 (1964); Mr. Justice Goldberg and Mr. Justice Black thought the earlier order proper. We must therefore initially pass upon appellee's contention that the appeal is untimely because not taken within the 30 days normally allowed.

It is in the last degree undesirable to read into a procedural statute or rule, fixing the time within which action may be taken, a hidden exception or qualification that will result in the rights of clients being sacrificed when capable counsel have reasonably relied on the language. Section 2107 of Title 28 and F.R.Civ.Proc. 73(a) unequivocally allow "to all parties" 60 days to appeal in any action "in which the United States or an officer or agency thereof is a party." The stated criterion is whether the United States is a party to the action, a test clearly satisfied here, and not whether the United States is concerned with the particular order sought to be appealed—something that often cannot be accurately determined when the order is made. The only contrary case cited by appellee is Virginia Land Co. v. Miami Shipbuilding Corp., 201 F.2d 506 (5 Cir. 1953), where the court did say that the statute and Rule were "not intended to change the rule in respect to appeals by other persons from orders with which the United States had no concern simply because of the fact that the United States was a party to the proceeding below but not to the issues involved in the appeal." Whether or not we would follow that statement on such extreme facts as were there presented, we find it inapplicable here, as other courts of appeal have found when it has been cited to them. Division of Labor Law Enforcement v. Stanley Restaurants, Inc., 228 F.2d 420, 423 (9 Cir. 1955); American Export Lines, Inc. v. Revel, 262 F.2d 122, 126 (4 Cir. 1958); East v. Crowdus, 302 F.2d 645, 646–647 (8 Cir. 1962). In the Fifth Circuit case the United States had brought suit against Miami Shipbuilding

United States, 302 U.S. 230, 58 S.Ct. 178, 82 L.Ed. 219 (1937), which we had also noted, 317 F.2d at 92, fn. 3, in both of which it had taken jurisdiction over appeals from rulings subsequent to the final decree. The Aluminum case involved a controversy between the Government and the defendant. However, in the Terminal R. R. Ass'n case, which we erroneously thought to indicate that appellate jurisdiction in cases like the instant one lay in the Supreme Court, the opinion had characterized the issue as being between the lines serving St. Louis from the west and the east sides of the Mississippi "as

to whether the former or the latter shall bear transfer charges on west-bound through freight," an issue collateral to the main objective of the antitrust suit. The Court said "The proceedings were instituted by the west side lines, not to vindicate the authority of the court, but to enforce rights claimed by them under the original decree" and also noted that the Government had not joined in the complaint or participated in the hearing in the District Court although it had joined the applicant lines on appeal. 266 U.S. at 27, 45 S.Ct. at 7, 69 L.Ed. 150.

Corporation for unpaid taxes and had had a receiver appointed; Virginia Land had filed a claim; four years after the United States had settled with Miami Shipbuilding and the receivership had been terminated, Virginia Land moved to have Miami Shipbuilding substituted as a respondent and to avail itself of the 60-day provision for appealing from a denial.[2] The United States had thus long since become a merely nominal party.

That is a far cry from this case. The consent decree gives the United States a continuing role in this action, authorizing it by the usual provisions to inspect the records of the defendant, to interview its officers, and to require reports from it; retaining jurisdiction to enable any of the parties to apply "for such further orders and directions as may be necessary or appropriate in relation to the construction of or carrying out of this Judgment, for the modification thereof, for the enforcement of compliance therewith and for the punishment of violations thereof"; and providing that at any time after five years the United States might apply for vacation or modification of the Judgment. It is patent that the United States had an interest in the very application here made. As the plaintiff at whose instance the decree was entered, the United States had a stake in having the bargain performed according to its understanding of what had been agreed; if appellants are right in saying that the decree required ASCAP to grant the type of license they sought, ASCAP's refusal would thus present an issue of compliance on which the United States might well desire to be heard. On the other hand, if appellants are seeking to impose on ASCAP obligations it had not undertaken, the United States might have an interest in opposing, because of the adverse effect such a precedent might have on its ability to obtain consent decrees in other cases, or for substantive reasons. Indeed, the United States did submit two memoranda to the District Court. In the first it took the position "that should the applicant show their request to be reasonable, in our opinion, the judgment requires ASCAP to offer a license of the type requested," and in the second it went further in aligning itself with appellants. Although this is not a requisite to the applicability of the 60-day provision, the Government could thus have appealed from the dismissal of appellants' applications—although we cannot now be altogether sure to what court such an appeal would have lain. Similarly if the United States had sided with ASCAP in the district court, it could have appealed from an order granting appellants' applications. Indeed, when the case was last here, the United States did participate to the extent of urging that the appeal be dismissed for want of jurisdiction on our part.

Appellee responds to such considerations by saying, with no little force, that however all this might seem if we were free to exercise our judgment, the Supreme Court has conclusively determined that "The controversy which is disposed of by the District Court's order is entirely between private parties and is outside the main stream of the litigation in which the Government is directly concerned." 375 U.S. at 40, 84 S.Ct. at 11 L.Ed.2d 8. But we cannot assume the Supreme Court thus meant to force us to hold the appeal untimely. If the Court had thought its language had the controlling effect for which appellee contends, it would not initially have reversed our judgment and remanded to us for consideration on the merits, but would have denied certiorari or affirmed on the ground of untimeliness, which appellee's brief in opposition to the grant of certiorari had urged as an alternative support for our dismissal of the appeal. Also the dissent on the order on rehearing makes it clear that the entire Court considered the issue of timeliness to be fairly open for our consideration on remand. The reconciliation between

---

2. As an alternative ground the court held that the order denying substitution was not appealable.

the Supreme Court's view on the applicability of the Expediting Act and ours on the applicability of the 60-day rule may be that the controversy is within the stream of the Government's interest although not within "the main stream." To whatever extent the 60-day rule requires that the Government be more than a nominal party, we hold that the requirement was satisfied here, and that the appeal to this court thus was timely.

### II.

The Amended Final Judgment of March 14, 1950, considerably amplified an earlier consent judgment entered in the Government's antitrust suit against ASCAP nine years before. The 1941 judgment contained many negative injunctions with respect to licensing, but had no provision specifically addressed to television, which had not yet been developed commercially, and no provision for judicial fixing of license fees if a licensee and ASCAP were unable to agree on terms. The 1950 Judgment was designed, in part, to fill these gaps, as well as to meet the problems with respect to motion picture licensing revealed by Alden-Rochelle, Inc. v. ASCAP, 80 F.Supp. 888 (S.D.N.Y.1948) and M. Witmark & Sons v. Jensen, 80 F.Supp. 843 (D.Minn. 1948).

The request which the appellant television stations made of ASCAP on October 18, 1961, was for new blanket and per program licenses [3] that would exclude not only programs obtained from a television network, comprising some 62% of the program time of network affiliated stations, as was the case in the licenses previously negotiated,[4] but also programs consisting of filmed or taped material made by independent film producers, comprising some 68% of the broadcasters' non-network program time. The economic effect of a license thus restricted would be that either the producer would have to make his own performance licensing arrangements with ASCAP or the copyright owner, or the television station would have to negotiate these on an individual basis before broadcasting; the complications incident to the latter alternative would be likely to cause the former generally to be the practical result. ASCAP refused to grant the request for the new form of licenses and the District Court declined to require it to do so.

Appellants place prime reliance on the opening sentence of Section IX(A) of the Judgment, which says:

"Defendant ASCAP shall, upon receipt of a written application for a license for the right of public performance of any, some or all of the compositions in the ASCAP repertory, advise the applicant in writing of the fee which it deems reasonable for the license requested."

Although a strictly literal reading of this would indeed require ASCAP to quote a fee for any type of license requested, such a reading ignores both context and good sense. The sentence is the springboard for a complicated set of provisions, stretching over two printed pages, which prescribe the mechanics for arriving at

---

3. Under the "blanket" license in effect at the time, payment consisted, generally speaking, of a "Sustaining Fee" of an amount per month equal to the station's highest charge for a quarter-hour of television broadcasting, and a "Commercial Fee" of 2.05% of its net receipts from sponsors for local television programs, subject to certain exclusions. Under the "per program" license the station paid a "Commercial Fee" equal to 4% of its net receipts from sponsors for local commercial television programs consisting of films produced originally for use in motion picture theatres and mak-

ing only incidental use of ASCAP music and 9% of such net receipts on other local commercial television programs using ASCAP music, both subject to certain exclusions, plus a "Sustaining Fee" of 3½% of the charge on sustaining programs using ASCAP music.

4. Such licenses had been negotiated in 1949, 1954 and 1958. Until 1949 ASCAP had granted television stations royalty-free licenses in an endeavor to assist the stations and promote the growth of the industry.

reasonable fees; the purpose of Section IX was to describe *how* fees were to be set for licenses that ASCAP was bound to grant, not to delineate ASCAP's obligations to grant them. Appellants' counsel concedes that ASCAP was not bound to grant every kind of license which the ingenuity or whim of hundreds of television station owners could devise; commendable and necessary as the concession is, it undermines the argument for a literal reading. We construe the sentence as relating to requests for licenses which some other portion of the Judgment required ASCAP to grant.

The first section of the Judgment mandating the issuance of licenses is Section V. This requires ASCAP "to issue, upon request, licenses for rights of public performance of compositions in the ASCAP repertory * * * (A) To a radio broadcasting network, telecasting network or wired music service * * * *on terms which * * * do not require a separate license for each station or subscriber for such performances"*; (B) To a manufacturer, producer or distributor of a transcription or recordation of a composition in ASCAP's repertory

which is or shall be recorded for performance on specified commercially sponsored radio programs or television programs, as the case may be, on an electrical transcription or on other specially prepared recordation intended for radio broadcasting or for television broadcasting purposes * * * of the right to authorize the broadcasting, by radio or by television, as the case may be, of the recorded composition by means of such transcription or recordation by all radio stations or television stations in the United States enumerated by the licensee, *without requiring separate licenses for such enumerated stations for such performances,"* and "(C) To any person engaged in producing motion pictures" as therein described. (Emphasis supplied). Manifestly appellants are not within Section V, although the italicized clauses of (A) and (B) have a bearing that we will consider below. Passing Section VI for the moment, we come to Section VII, which is so important that we set it out in full in the margin.[5]

Section VII appears to be the one where the draftsmen set down in detail what licenses individual broadcasters

5. "VII. Defendant ASCAP, in licensing rights for public performance for radio broadcasting and telecasting, is hereby:

"(A) Enjoined and restrained from issuing any license, the fee for which

"(1) in the case of commercial programs, is based upon a percentage of the income received by the licensee from programs which include no compositions in the ASCAP repertory, or

"(2) in the case of sustaining programs, does not vary in proportion either (a) to the performance of compositions in the ASCAP repertory during the term of the license, or (b) to the number of programs on which such compositions or any of them are performed,

unless the radio broadcaster or telecaster to whom such license shall be issued shall desire a license on either or both of such bases;

"(B) Ordered and directed to issue to any unlicensed radio or television broadcaster, upon written request, per program licenses, the fee for which

"(1) in the case of commercial programs, is, at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed, or (b) based upon the payment of a percentage of the sum paid by the sponsor of such program for the use of the broadcasting or telecasting facilities of such radio or television broadcaster,

"(2) in the case of sustaining programs, is at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed, or (b) based upon the payment of a percentage of the card rate which would have been applicable for the use of its broadcasting facilities in connection with such program if it had been commercial, and

"(3) subject to the other provisions of Section VIII, takes into consideration the economic requirements and situation of those stations having relatively few commercial announcements and a relatively greater percentage of sustaining programs, with the objective that *such* stations shall have a genuine

could demand. The only type of license specifically required in all cases is the per program license, although Section VII (B) (3) in the case there considered requires that ASCAP shall take action that will give "a genuine economic choice between per program and blanket licenses" and Section VIII, which is not restricted to radio or television, orders ASCAP "to use its best efforts to avoid any discrimination among the respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses." Nothing in Section VII requires a license which excludes programs recorded by producers or, for that matter, distributed by networks.

It is true, however, and this is the crux of the case, that Section VII must be read along with the clauses of Section V(A) and (B) which we have italicized. Appellants make no complaint as to the manner in which the existing licenses deal with the network problem covered by Section V(A); the licenses are limited to local television programs and these are so defined as to exclude network programs. The complaint is that the situation dealt with in Section V(B) is handled differently, by a provision in the blanket license that

> "No payment shall be required hereunder with respect to a local commercial television program of LICENSEE presented by motion picture or by transcription if a license has been granted by SOCIETY (as distinguished from its members) at the source to perform on such local commercial television program by means of such motion picture or such transcription, as the case may be, the musical compositions embodied therein."

and a somewhat broader provision in the per program license excluding payment where a license was granted at the source either by ASCAP or by the composers, authors, or publishers. If producers uniformly cleared at the source as the networks do, the effect of the two differently worded provisions would seem identical. Appellants' grievance is that, as they offered to prove, producers have not cleared at the source and the exclusionary provision as to programs filmed or taped has thus been of no practical value to the broadcasters.

■■ Although we assume that Section V(B) would entitle a producer to a license that would wholly exempt "enumerated stations" from any need of a license, we are unable to find any provision in the Judgment that entitled television stations to demand licenses excluding programs thus produced. The provisions of Section V(A) and (B) requiring ASCAP to license networks and producers in a manner that will relieve their members and customers of the need of obtaining separate licenses seem to have been designed for the benefit of the networks and the producers, not for that of the television stations, whose rights are specified in Section VII. Section V orders ASCAP to grant licenses that will *permit* networks and producers to clear at the source, and this it has done. Appellants demand a license which, as a practical matter, will *require* producers to do so. That the existing licenses leave such clearance at the option of the producer of the non-network program, who has scant incentive to obtain this, does not seem to us to deny any rights which the Judgment confers on television stations.[6] It is important to the obtaining of consent decrees, on which the effective enforcement of the antitrust laws depends in no small degree, that de-

---

economic choice *between per program and blanket licenses;*
"(C) Enjoined and restrained from requiring or influencing the prospective licensee to negotiate for a blanket license prior to negotiating for a per program license."

6. Although appellants are clearly not precluded from seeking a change in the *status quo*, we cannot regard the decade of acquiescence in the existing types of license as wholly irrelevant to the construction of the Judgment.

fendants who sign them should know these will not be stretched beyond their terms. Hughes v. United States, 342 U.S. 353, 357, 72 S.Ct. 306, 96 L.Ed. 394 (1952); United States v. Atlantic Refining Co., 360 U.S. 19, 23, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959).

The final string to appellants' bow is Section VI, which we quote in the margin.[7] Appellants would have us read the first sentence as requiring ASCAP to grant a license for all compositions in the ASCAP repertory to whatever extent "any user" demanded. The answer is similar to that made in respect of Section IX(A). General language of this sort, applying to all kinds of users, cannot fairly be read as overriding the specific and detailed provisions relating to television stations, networks and producers. Section VI was addressed to an altogether different problem; what it says is that ASCAP must place itself in a position where, without the members' assent, it can grant the request of any applicant who wants the whole ASCAP repertory but that it may not grant a license for particular compositions without the member's request or notice to him.

 We have not overlooked appellants' argument that ASCAP's refusal to issue the type of license they request has anti-competitive consequences which should lead us to resolve ambiguities in their favor. But, apart from the fact that the Judgment does not appear to us to be truly ambiguous, we are faced with ASCAP's answer that the relief sought by appellants would be seriously detrimental to independent music writers and would itself adversely affect competition by facilitating the activities of Broadcast Music, Inc., a music licensing and

publishing organization controlled by the combined television and radio broadcasting industry. If appellants' position in fact has the merit under the antitrust laws which they assert, they have effective remedies available, either by persuading the Department of Justice to apply under Section XVII for a modification of the Judgment, or by a private suit which our ruling here in no way affects. Sam Fox Publishing Co. v. United States, 366 U.S. 683, 689, 81 S. Ct. 1309, 6 L.Ed.2d 604 (1961). We decide only that the District Court did not err in holding that the Judgment as it now stands does not require ASCAP to issue licenses of the sort appellants requested.

Affirmed.

---

7. "VI. Defendant ASCAP is hereby ordered and directed to grant to any user making written application therefor a non-exclusive license to perform all of the compositions in the ASCAP repertory. Defendant ASCAP shall not grant to any user a license to perform one or more specified compositions in the ASCAP repertory, unless both the user and member or members in interest shall have requested ASCAP in writing so to do, or unless ASCAP, at the written request of the prospective user shall have sent a written notice of the prospective user's request for a license to each such member at his last known address, and such member shall have failed to reply within thirty (30) days thereafter."