**COLUMBIA BROADCASTING SYSTEM, INC., Plaintiff,**

v.

**AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et al., Defendants.**

**No. 69 Civ. 5740.**

United States District Court, S. D. New York.

Jan. 20, 1972.

See also D.C., 53 F.R.D. 231; 320 F.Supp. 389.

Cravath, Swaine & Moore, New York City, for plaintiff; Alan J. Hruska, Robert K. Baker, Ronald S. Rolfe, John A. Lucido and J. Barclay Collins, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, Herman Finkelstein, New York City, for ASCAP and defendants Coleman, Hamilton, Schwartz and Washington; Simon H. Rifkind, Jay H. Topkis, Allan Blumstein, and Max Gitter, New York City, of counsel.

LASKER, District Judge.

This is a civil antitrust action by Columbia Broadcasting System, Inc. ("CBS") against American Society of Composers, Authors and Publishers ("ASCAP") and others for alleged violations of the Sherman Act. ASCAP and the defendants who are members of its board of directors move, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint. For the reasons set forth below, the motion is denied.

ASCAP is an unincorporated association of approximately 17,500 authors, publishers and composers of musical compositions which was organized in 1914. Its members have granted ASCAP, as their common licensing agent, the nonexclusive right to license their works. In exchange, ASCAP assists its members by distributing and collecting revenues, as well as policing and protecting the works against copyright infringement by maintaining a complex surveillance system of radio and television broadcasts.

CBS, a national radio and television broadcaster, is a licensee of ASCAP's repertory.

In 1941, the government sued ASCAP for violations of the antitrust laws. As a result of that litigation a consent decree was entered in 1941 which required ASCAP to grant licenses to users in proportion to the amount of music used. In 1950 that decree was substantially amended to remedy certain deficiencies.

Under the 1950 amended judgment, ASCAP is required to offer two types of license to the broadcasters—a "blanket" license and a "per program" license. Both licenses grant the user the right to use any or all of the works in ASCAP's repertory. The difference between the two is that the blanket license allows use of the *entire* inventory for a period of time—generally, in the history of the parties, one year—for which ASCAP receives a fee based upon a fixed percentage of the licensee's overall revenues for that period; whereas a per program license, as its name suggests, allows the use of the entire ASCAP inventory only for one broadcast program and the fee is based upon a fixed percentage of revenues derived from that program.

The 1950 decree also enjoins ASCAP from discrimination in fees which "would deprive the licensees . . . of a genuine choice among such various types of licenses" (Par. VIII) and specifies that it must offer comparable fees to all applicants similarly situated (Par. IX(C)). Under the decree a special procedure is established for the determination of licensing fees. Upon the receipt of a license application, ASCAP is required to "advise the applicant in writing of the fee it deems reasonable for the license requested." If ASCAP and the prospective user are unable to agree upon a fee, the decree provides that the applicant "may forthwith apply to [the District Court for the Southern District of New York] for the determination of a reasonable fee . . . ." (Par. IX). Finally, ASCAP's licensing authority is not exclusive. The amended decree provides that prospective licensees may bypass ASCAP and secure a license directly from the individual composer, author or publisher.

I.

The thrust of CBS' complaint is that the availability of ASCAP's blanket and per program licenses is not sufficient to satisfy the commands of the Sherman Act. CBS contends that these options "compel a broadcaster to pay for the right to use all copyrighted music in the ASCAP pool, even though it might want rights only as to some of those musical compositions." (Par. 10, Complaint). In other words, CBS asserts that ASCAP

is "using the leverage inherent in its copyright pool to insist that plaintiff pay royalties on a basis which does not bear any relationship to the amount of music performed." (Par. 19, Complaint). Finally, as to individual licensing, CBS alleges that "[a]ny attempt by plaintiff to acquire such a large body of rights from the individual members of ASCAP . . . would be wholly impracticable . . ." (Par. 15, Complaint).

CBS does not contend that ASCAP has violated the decree. It contends, however, that the procedures by which ASCAP operates under the 1950 amended judgment constitute illegal price fixing, boycotting, and tying. CBS asserts that the grant of a proposed "per-use" license[1] (payment measured by the actual use of copyrighted music) "would go far toward unraveling the strands with which this combination has hogtied competitive market forces since 1914."

## II.

ASCAP's motion for summary judgment is predicated on the contention that the Ninth Circuit, in K–91, Inc. v. Gershwin Publishing Corp., 372 F.2d 1 (9 Cir., 1967), cert. denied 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968), rejected the same antitrust claims that CBS now asserts here. Thus, this motion presents the narrow issue whether under the rationale of K–91 summary judgment for ASCAP should be granted.

K–91 was an action for copyright infringement brought by several members of ASCAP against a radio broadcaster operating in the State of Washington. The broadcaster admitted the infringement allegations, but defended on the ground that ASCAP had formed an unlawful combination in violation of the Sherman Act which was engaged in price-fixing and block-booking of its members' works. The trial court upheld plaintiff's claims and rejected defendants' counterclaims and defenses.

The Ninth Circuit, in affirming the trial court's rejection of defendants' antitrust allegations, stated:

"We agree with the trial court that the activities of ASCAP do not constitute a combination in restraint of trade or a monopoly within the meaning of the Sherman Act. ASCAP is certainly a combination, but not every combination is a combination in restraint of trade or a monopoly." 372 F.2d at 4.

The Court's affirmance rested on three grounds. As to the price-fixing allegation, the Court stated:

"ASCAP cannot be accused of fixing prices because every applicant to ASCAP has a right under the consent decree to invoke the authority of the United States District Court for the Southern District of New York to fix a reasonable fee whenever the applicant believes that the price proposed by ASCAP is unreasonable, and ASCAP has the burden of proving the price reasonable. In other words, so long as ASCAP complies with the decree, it is not the price fixing[2] authority." Id. at 4.

---

1. Under CBS' proposed per-use license system, a user would pay a lump sum for the right to gain access to ASCAP's pool of musical compositions ("library card right"). During the term of the license, the user would pay an additional fee for each use of music covered by the "library card" but not licensed directly from individual proprietors. The per-use fee would vary depending on the nature of the use. Broadcasters would also retain the right to deal with individual proprietors directly:

2. At first blush ASCAP's reliance on the rationale of the K–91 court has great attraction because on the face of it it appears that ASCAP cannot be guilty of fixing prices when, under the decree, any applicant has a right to request a judge of this court to fix a reasonable fee if the applicant disputes the reasonableness

With regard to the other Sherman Act violations alleged, the Court stated:

"We cannot agree with the contention that the danger of unreasonable activity that might arise from ASCAP's activities makes everything that it does a violation of the antitrust laws, when those of its potential activities that might have this effect are prohibited by the decree. No contention is here made that ASCAP's actual activities do not comply with the decree. In short, we think that as a potential combination in restraint of trade, ASCAP has been 'disinfected' by the decree." *Id.*, at 4.[3]

After their claims were rejected by the Ninth Circuit, petitioners appealed to the Supreme Court. Before acting upon the petition the Supreme Court invited the Solicitor General to express the views of the United States in an amicus curiae brief. While the Solicitor General approved the result of the *K–91* court in the limited context of the case, his brief contained pertinent caveats which we discuss below. Thereafter the Supreme Court denied certiorari.

### III.

While the antitrust allegations of the petitioners in *K–91* and those of CBS are substantially similar, one outstanding difference exists between the two cases which compels a denial of ASCAP's motion. No proposal was made to the *K–91* court of a practical alternative to per program and blanket licensing such as CBS proposes here. And, thus, finding that some form of central licensing system was necessary in the mu-

sic publishing field, the Ninth Circuit applied a "rule of reason" test to ASCAP's activities and found that there was no violation of the antitrust laws.

■ We agree with the Ninth Circuit that a rule of reason test and not a *per se* test should be applied to ASCAP's activities. As the Solicitor General said in his amicus curiae brief to the Supreme Court:

" . . . in the present state of technology there appears to be no effective means by which the enormous number of separate performances broadcast each year by commercial stations across the nation can be accounted for by copyright holders. . . . It would appear, therefore, that there must be some form of centralized licensing system which serves the mutual interests of copyright holders and of music users . . . "

When economic realities of the market place dictate such treatment the Supreme Court has often applied the rule of reason test to activities which would otherwise call for the *per se* test. Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); United States v. Terminal Railroad Ass'n, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912).

However, the application of a rule of reason test to ASCAP's activities does not mean that it is immune to the antitrust laws. Nor does the regulation of

---

of ASCAP's proposal. However, the argument does not meet CBS' contention that a "reasonable" price is not necessarily a competitive price. CBS argues that a "reasonable" price fixed by a judge under the decree, however objectively determined, is not the equivalent of a price determined in the market place.

3. The Court also observed in *K–91*, supra, 372 F.2d at 4:

"There is an additional reason why the activities disclosed by this record do not

violate the antitrust laws. ASCAP's licensing authority is not exclusive. The right of the individual composer, author or publisher to make his own arrangements with prospective licensees, and the right of such prospective licensees to seek individual arrangements, are fully preserved."

We discuss this rationale in the text below.

ASCAP by the consent decree furnish it immunity. As the Second Circuit Court stated in United States v. ASCAP (Application of Shenandoah Valley Broadcasting, Inc.), 331 F.2d 117 (1964), a user is not estopped by the decree from maintaining an antitrust suit against ASCAP:

> "We have not overlooked appellants' argument that ASCAP's refusal to issue the type of license they request has anti-competitive consequences which should lead us to resolve ambiguities in their favor. But, apart from the fact that the Judgment does not appear to us to be truly ambiguous, we are faced with ASCAP's answer that the relief sought by appellants would be seriously detrimental to independent music writers and would itself adversely affect competition . . . If appellants' position in fact has the merit under the antitrust laws which they assert, they have effective remedies available, either by persuading the Department of Justice to apply under Section XII for a modification of the Judgment, or by a private suit which our ruling here in no way affects. Sam Fox Publishing Co. v. United States, 366 U.S. 683, 689, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961)."

See also Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Carter-Wallace, Inc. v. United States, (Ct.Cl., 449 F.2d 1374, 1971); Sam Fox Publishing Co. v. United States, 366 U.S. 683, 689–690, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961); p. 14, amicus curiae brief of Solicitor General in K–91, Inc. v. Gershwin Publishing Corp., supra.

■ Granted that a party is subject to attack under the antitrust laws despite the presence of a consent decree, the question we are presented with in this case is: Under what circumstances may a defendant's activities, previously sanctioned as falling withing the rule of reason, be currently judged to be in violation of the antitrust laws? We find a guide to the answer in the Supreme Court's ruling in Silver v. New York Stock Exchange, supra.

In *Silver*, the New York Stock Exchange had, without giving reason for its action, ordered the discontinuance of direct wire telephone connections between certain members of the New York Stock Exchange and non-members. The result was that one petitioner was forced out of business and another's business was greatly diminished. The issue presented was: ". . . whether the Securities Exchange Act has created a duty of exchange self-regulation so pervasive as to constitute an implied repealer of our antitrust laws, thereby exempting the Exchange from liability in this and similar cases." *Id.*, 373 U.S. at 347, 83 S.Ct. at 1251. The Court explained that the proper approach in such a case was not an analysis which required either total exemption or non-exemption, but one "which reconciles the operation of both statutory schemes with one another . . ." (at 357, 83 S.Ct. at 1257). Finding that the Securities Exchange Act contained no express exemption from the antitrust laws, and that therefore the Exchange was only potentially immune in appropriate circumstances, the Court stated:

> "Repeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes." *Id.*, at 357, 83 S.Ct. at 1257.

The Court held that the Exchange had violated the "minimum extent" rule by having no provision for some method of notice and hearing to a protesting non-member.

■ ASCAP's operation under the "regulatory system" of the 1950 amended judgment may be reasonably analogized to the Exchange's operation under the Securities Exchange Act. For the

purposes of the discussion we may regard the 1950 amended judgment as constituting an implied partial repeal of the antitrust laws. In other words, the 1950 decree sanctions, under the aegis of the rule of reason, activities (i. e., price fixing, group boycotting, tying) which would otherwise be illegal *per se* but for the unusual economic conditions prevailing in the music publishing business. Applying the *Silver* rationale, the proper approach here is to reconcile the "regulatory system" of the 1950 amended judgment with the antitrust laws, bearing in mind that the regulatory system may be permitted to encroach upon the antitrust laws only to the "minimum extent necessary."

■ The policy of the consent decree is clear: the maintenance of an orderly market in the music publishing industry. In this context the words of the Solicitor General bear repeating:

> "If the market is to *function at all* there *must* be . . . some kind of central licensing system." (Emphasis supplied.)

Nevertheless, the *Silver* case informs us that however necessary a regulatory system may be, that regulatory system may remain "exempt" under the antitrust laws only to the minimum extent necessary to preserve its purpose: here the purpose of maintaining an orderly market. In other words, if CBS can prove that the regulatory system can be amended to operate on a more competitive basis, it would by definition mean that the antitrust laws were being encroached upon more than to the "minimum extent necessary."

■ The *K–91* court was not presented with the issue put before us because there the broadcasters did not propose to the court an alternative form of licensing. The distinction is critical to this motion. Indeed, in *K–91* the parties stipulated that it would be virtually impossible for broadcasters and copyright holders to arrange separate licenses and payments for each performance on radio of a copyrighted composition. The full text of the stipulation is:

> "It would be commercially, practicably and virtually impossible for defendant and almost all other broadcasters to acquire a separate license for each performance broadcast over commercial stations. It would be commercially, practicably and virtually impossible for plaintiffs and other composers, authors and publishers to issue a separate license for each performance broadcast over broadcasting stations or to have their payment for such performances on the basis of each individual use."

Thus, the parties in *K–91* agreed that no practical alternatives were available to per program and blanket licensing, and none was proposed—which is, of course, the antithesis of CBS' position, and which removed from issue in the *K–91* case the very issue here presented. Had the Ninth Circuit been presented with an alternative proposal, it might well be that it would not have found ASCAP to have been "disinfected" by the consent decree. Under the rationale of *Silver*, an "exempt" group is only "disinfected" from the strictures of the antitrust laws while it remains within the boundaries of the "minimum extent" rule.

*K–91* was, therefore, an entirely different ball game than the one we are attending. The Solicitor General reflected this view in his brief (at 13):

> "If the record here furnished any substantial basis for concluding that practical alternatives exist to bulk licensing of recorded music, a different case would be presented . . . [P]etitioner should have at least come forward with evidence demonstrating a reasonable possibility that alternative methods are feasible . . . Collective activity necessary for a market to function must go no further than absolutely necessary."

As indicated in footnote 3, the Ninth Circuit's third ground for finding no violation of the antitrust laws was that ASCAP's licensing authority is not exclusive and that an individual composer may make his own arrangements with prospective licensees. We find this view of the matter inconsistent with the stipulation of the parties in *K–91* itself. But whether our interpretation on that point is correct or not, we are doubtful in any event of the practical value of the "nonexclusive right" under the present system. We are inclined to agree with the court in Schwartz v. Broadcast Music, Inc., 180 F.Supp. 322, 333 (1959). There Judge Weinfeld observed as to the argument that a user always has the "option" to seek an individual license: "The nonexclusive right allegedly retained by the plaintiffs [composers and authors] is more apparent than real." [4]

For the reasons stated above the motion for summary judgment is denied.

██ We express no views at this point as to the feasibility of CBS' "per-use" proposal or whether a judicially determined fee is the economic equivalent of a fee fixed in the market place. We hold only that genuine issues of material fact exist as to these questions and that CBS is entitled to prove its contentions at trial.

Defendants' motion is denied.

It is so ordered.

4. Furthermore, ASCAP's general counsel has acknowledged in deposition the impracticability of a user's being able to fulfill its requirements for music by dealing directly with ASCAP members:
 "Q Let me ask you this. Is it true that large-scale users of copyrighted musical works would find it wholly impractical to deal with individual copyright owners to fulfill their requirements for music performing rights?
 "A I believe they would.
 "Q Is CTN a large-scale user?
 "A Oh, yes." (HF Dep. 46–47)

Counsel for the moving parties expressed the same view at the oral argument on the instant motion:
 "THE COURT: As a practical matter do ASCAP members actually license individually?
 . . . . . . . . . . . . . . . . . . . , . . . . . . . . . . . . . . . .
 "MR. RIFKIND: . . . Whether in fact anybody else has done it, I don't believe that I ever heard of CBS or NBC or any other station actually going out to look for an individual license. As a practical matter I think the answer is negative." (Tr. 19)