Daniel G. BUONOCORE,
Plaintiff–Appellee,

v.

Donald L. HARRIS, Special Agent,
Bureau of Alcohol, Tobacco and
Firearms, Defendant–Appellant,

and

David R. Cundiff, Deputy Sheriff, Franklin County Sheriff's Department; Chesapeake and Potomac Telephone Company of Virginia; James D. Thompson, Assistant Manager, Chesapeake and Potomac Telephone Company of Virginia; Linda Sue Taylor; United States of America, Defendants.

Daniel G. BUONOCORE,
Plaintiff–Appellee,

v.

David R. CUNDIFF, Deputy Sheriff,
Franklin County Sheriff's Department,
Defendant–Appellant,

and

Donald L. Harris, Special Agent, Bureau of Alcohol, Tobacco and Firearms; Chesapeake and Potomac Telephone Company of Virginia; James D. Thompson, Assistant Manager, Chesapeake and Potomac Telephone Company of Virginia; Linda Sue Taylor; United States of America, Defendants.

Nos. 94–1901, 94–1932.

United States Court of Appeals,
Fourth Circuit.

Argued April 4, 1995.

Decided Sept. 12, 1995.

---

**ARGUED:** Valerie Lisabeth Tetro, Joseph F. Cunningham & Associates, Washington, DC, for appellant Harris; Elizabeth Kay Dillon, Woods, Rogers & Hazlegrove, Roanoke, VA, for appellant Cundiff. Terry N. Grimes, King, Fulghum, Snead, Nixon & Grimes, P.C., Roanoke, VA, for appellee. **ON BRIEF:** Joseph F. Cunningham, Joseph F. Cunningham & Associates, Washington, DC, for appellant Harris; W. Fain Rutherford, Randy V. Cargill, Woods, Rogers & Hazlegrove, Roanoke, VA, for appellant Cundiff.

John T. Boitnott, Rocky Mount, VA, for appellee.

Before HAMILTON, WILLIAMS, and DIANA GRIBBON MOTZ, Circuit Judges.

Dismissed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge HAMILTON and Judge WILLIAMS joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In this case a homeowner alleged that two law enforcement officers, after obtaining a warrant to search his home, invited a private person to engage in an independent general search of the home for items never mentioned in the warrant. In the face of these allegations, the officers asserted that qualified immunity entitled them to summary judgment and have now appealed the district court's refusal to so hold. For the reasons set forth within, we dismiss their appeals.

### I.

This case arises out of a search of Daniel G. Buonocore's home conducted on November 24, 1992. For over two years prior to that date, Buonocore had lived with Linda Sue Taylor. Apparently following a quarrel with Buonocore, Taylor moved out of Buonocore's home on November 12, 1992, and, on that same day, contacted Deputy David Cundiff of the local sheriff's office. Taylor told Cundiff that she had seen illegal and unregistered firearms in Buonocore's home, including a machine gun that Taylor claimed to have previously fired and a shotgun that she allegedly helped modify by sawing off the barrel. Taylor also reported that Buonocore, then employed by the Chesapeake and Potomac Telephone Company (C & P), had in his possession property belonging to C & P. Upon hearing these charges, Cundiff contacted not only Special Agent Donald L. Harris of the Bureau of Alcohol, Tobacco and Firearms (ATF), so that Harris could obtain a federal search warrant for Buonocore's residence, but also James D. Thompson, a corporate security officer at C & P. Cundiff invited Thompson to attend the search and identify any C & P property that might be discovered.

On the afternoon of November 24, 1992, Harris applied for and received a warrant to search Buonocore's home from the United States District Court for the Western District of Virginia. The warrant only permitted Harris or another "authorized officer" to search Buonocore's house, including the attached garage, for "firearms not registered to him in the National Firearms Registration and Transfer Records." At approximately 8:00 p.m. that evening, Harris, accompanied by Cundiff, Thompson, and other ATF agents and deputy sheriffs, arrived at Buonocore's residence to execute the warrant. Buonocore was home when they arrived. All of these facts are undisputed. What happened next, however, is very much disputed.

Buonocore asserts in his affidavit that C & P employee, Thompson, entered Buonocore's home "as soon as ATF had secured the residence." Buonocore claims he immediately asked Thompson to leave the premises, but that Thompson refused to leave. According to Buonocore, Thompson, independently of Harris or Cundiff or any other officer, searched for telephone equipment in a tool box located on Buonocore's truck and in parts of Buonocore's residence that the law enforcement officers had not searched. Buonocore alleges that he kept the machine gun and sawed off shotgun in a locked gun safe and that as soon as the officers told him they were searching for these weapons, he unlocked the gun safe so that the officers could examine them. Buonocore maintains that he did not steal any items from C & P and that the few items belonging to C & P discovered at his home had been discarded or were being repaired or modified by him. He further claims that "[n]one of the items in [his] residence were visibly and clearly marked as belonging to C & P Telephone Company."

In contrast, Deputy Cundiff in his affidavit asserts he invited C & P employee, Thompson, to "be present at the time of the search" in order to "identify any property belonging to C & P Telephone should such be found during the search for the alleged illegal firearms." According to Cundiff, sometime "during the search of the residence," Cundiff

"noticed" a small amount of marijuana, the two weapons identified by Taylor, and "property that appeared to belong to C & P Telephone." Cundiff does not state when the C & P property was discovered or whether it was found before, at the same time, or after the guns were located. Nor does he state where the C & P equipment was found or whether it was located in close proximity to the guns. However, Cundiff does state that after "[h]aving seen property that was visibly and clearly marked as belonging to C & P Telephone Company in the residence[,] Thompson was brought in to the residence to identify the property."[1]

Thompson also filed an affidavit, which provides in its entirety:

1. I am employed by Bell Atlantic—Virginia, Inc. (formerly known as The Chesapeake and Potomac Telephone Company of Virginia) (hereinafter, "C & P") as Assistant Manager, Corporate Security, and I have personal knowledge of the facts contained in this Affidavit.

2. In November of 1992, I held the position of Assistant Manager, Corporate Security for C & P.

3. On November 24, 1992, I entered the home of Daniel Buonocore by invitation of the law enforcement authorities who were executing a federal search warrant. At that time, I observed a number of items of personal property which appeared to belong to C & P. I personally asked Mr. Buonocore where some of the items came from and he replied: "I got them from work."

4. I was present while the law enforcement authorities initiated and conducted a search of Buonocore's pickup truck and tool box.

5. On December 3, 1992, Buonocore returned to C & P a number of items of personal property which I had observed in his residence at the time of the search. This personal property that Buonocure returned to C & P included a blue installer's handset, a large yellow umbrella, a digging bar clearly marked as C & P property and other items including tape, cleaner and gloves.

Thus, Thompson's affidavit does not address his role in the search of or his time of entry into Buonocore's house.

The parties agree that upon inspection of Buonocore's weapons, the law enforcement officers discovered that both firearms were in fact legal in that the "machine gun" identified by Taylor was actually a semi-automatic rifle and the barrel of the sawed-off shotgun was within the legal limit. The only item seized from Buonocore's residence on November 24, 1992, was the marijuana. Buonocore was not charged with any offense as a result of the search, but he was dismissed from his job at C & P on December 3, 1992, for failing to secure "specific authorization" to have C & P property in his possession.

Buonocore filed this action against Harris, Cundiff, Thompson, and C & P, seeking damages for searching his home in violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983, and Virginia trespass law. The complaint also sought damages against Taylor for malicious prosecution. Upon motion by the United States, Harris was dismissed as a party with respect to Buonocore's trespass claim and the United States was substituted in his place under the Federal Employees Liability Reform and Tort Compensation Act, 28 U.S.C. § 2679(d). Additionally, the district court dismissed Buonocore's malicious prosecution claim against Taylor for ineffective service of process.

On June 6, 1994, the district court granted C & P and Thompson summary judgment on Buonocore's § 1983 claim and dismissed the state law trespass claim without prejudice. The court also dismissed the United States as a party for lack of subject-matter jurisdiction. In addition, the court dismissed the § 1983 claim against Harris and Cundiff because they were acting pursuant to federal, not state, law and granted summary judgment in favor of Cundiff with respect to the state law trespass claim. As to the sole remaining claim—a claim for damages under

---

1. Agent Harris filed no affidavit setting forth his version of how and by whom the search was conducted.

the Fourth Amendment pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)—the district court refused to grant Harris and Cundiff summary judgment on qualified immunity grounds.

Harris filed a notice of appeal on July 5, 1994. Cundiff, however, did not file his notice of appeal of the district court's June 6, 1994, order until July 20, 1994. No cross-appeal was filed.

## II.

Before addressing the question of whether summary judgment was properly denied on the qualified immunity defense, we consider a preliminary argument raised by Buonocore as to the timeliness of Cundiff's appeal.

■ Fed.R.App.P. 4(a)(1) provides, in pertinent part, that "[i]n a civil case ... if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by any party within 60 days after [the date of entry of the judgment]." In all other cases, the notice of appeal must be filed within 30 days of the entry of judgment. *Id.* Where the United States is a "party," the sixty-day period in which to appeal applies to *all* parties to the case, not just the United States. *Montelongo v. Meese*, 777 F.2d 1097, 1099 (5th Cir.1985); 9 Moore's Federal Practice ¶ 204.10, at 4–36.5 (2d ed. 1994). Since Cundiff filed his notice of appeal 44 days after the district court entered its order denying summary judgment, his appeal is not timely unless he can avail himself of the sixty-day provision. Thus, the key to this question is to determine whether the United States is a "party" to the case within the meaning of Fed.R.App.P. 4(a)(1).

■ In general, courts have construed Rule 4(a)(1) broadly. *Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1011 (8th Cir.1984); *see also United States v. American Soc'y of Composers, Authors and Publishers*, 331 F.2d 117, 119 (2d Cir.) (Friendly, J.) (advocating broad reading of predecessor rule to Fed.R.App.P. 4(a)(1)), *cert. denied*, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964). For example, it has

been held that the rule does not require the United States to be a party to the appeal. *See In re Paris Air Crash of March 3, 1974*, 578 F.2d 264, 265 (9th Cir.1978). Nor need the United States even have an interest in the particular order being appealed. *American Soc'y of Composers*, 331 F.2d at 119.

■ In *Wallace v. Chappell*, 637 F.2d 1345, 1347 (9th Cir.1981) (*en banc*) (*per curiam*), the Ninth Circuit noted it was adopting "a liberal reading of Rule 4(a) in order to alleviate uncertainty when the government has even an indirect interest" in a case. It then enumerated three factors, any of which, if present in a particular case, would permit invocation of the sixty-day appeal period. Under *Wallace*, the sixty-day rule applies if:

(a) the defendant officers were acting under color of office, *or* (b) the defendant officers were acting under color of law or lawful authority, *or* (c) any party in the case is represented by a government attorney.

*Id.* at 1348 (emphasis in original).

■ In this case, not one, but all three *Wallace* factors, appear to be present. First, notwithstanding the fact that Harris and Cundiff are being sued in their personal capacities, *see Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.1994) (*Bivens* action "must be brought against the federal officers in their individual capacities"), it is clear that when conducting the search, Harris and Cundiff were "acting under color of" their respective offices, *i.e.* as a federal agent and a state police officer assisting a federal agent, respectively. *See id.* at 1348 n. 6. Secondly, it is equally clear that they were conducting the search "under color of law." *See id.* at 1348 n. 7. Furthermore, since Harris was represented by government counsel until October 27, 1994—three months after Cundiff filed his notice of appeal—arguably, a "party in the case" was "represented by a government attorney." Moreover, at the time the district court issued the order which Cundiff appeals, the United States was indeed a named party in this case. It was this order—issued on June 6, 1994—that initiated the appeal period. Therefore, despite the fact that the June 6 order also dismissed

the United States as a party to the case, the United States was a party up until the moment the order was issued.

For all of these reasons, we conclude that Cundiff was entitled to the extended sixty-day period in which to file his appeal. The government's lack of participation or interest in this appeal does not affect Cundiff's entitlement to the extended filing period. *American Soc'y of Composers,* 331 F.2d at 119.

### III.

■ We now turn to the question of whether qualified immunity entitled Harris and Cundiff to summary judgment. Even officials who violate the Constitution are to be accorded qualified immunity and so escape liability for money damages if, in the performance of discretionary duties, "their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Torcasio v. Murray,* 57 F.3d 1340, 1343 (4th Cir. 1995); *Beardsley v. Webb,* 30 F.3d 524, 530 (4th Cir.1994); *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993). In deciding whether an official is entitled to qualified immunity, we must first determine "whether the plaintiff has alleged a violation of law that was clearly established at the time the challenged actions were taken." *DiMeglio v. Haines,* 45 F.3d 790, 794 (4th Cir.1995); *see also Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Maciariello,* 973 F.2d at 298. This is "a purely legal question." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). When determining this legal question a court must identify the "specific right allegedly violated," and then decide if "at the time of the alleged violation the right was clearly established." *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992).

Buonocore asserts that at the time of the search—November 24, 1992—"clearly established Fourth Amendment law prohibited"

government agents "from bringing a private citizen" into Buonocore's home to conduct an independent, general search for items not identified in any warrant. It is undisputed that Agent Harris only requested and only was issued a warrant for himself or another "authorized officer" to search Buonocore's residence and garage for illegal firearms. Buonocore alleges Harris and Deputy Cundiff nonetheless invited a C & P employee into Buonocore's home so that the C & P employee, acting independently of the government agents, could conduct a search not for the illegal firearms identified in the warrant, but for telephone equipment that was never mentioned in the warrant.

In deciding whether this alleged activity violated clearly established law as of November, 1992, we begin our analysis with the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. These few words contain two related concepts of particular importance here. First, by mandating that "no warrants shall issue" unless they "particularly" describe "the place to be searched" and "things to be seized," the Framers prohibited the use of general warrants issuable to anyone. Second, by expressly acknowledging the substantive "right of the people to be secure in their ... houses," the Framers recognized a person's special right to privacy, to be left undisturbed—except for reasonable searches—within his own home.

Examination of the common law leading up to ratification of the Fourth Amendment reveals what is implicated in these concepts, as well as the deliberateness and significance of the choice to adopt them. General warrants [2] directed at anyone were common in

---

**2.** The English government originally devised the general warrant as a method of combatting the publication of "printed matter deemed 'offensive

to the state' ". *Jenkins v. Chief Justice of Dist. Court Dept.,* 416 Mass. 221, 619 N.E.2d 324, 330 (1993) (quoting Potter Stewart, The Road to

Great Britain up until the 1700's. *See generally* Nelson B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 24–42 (1937).[3] However, in the face of strong opposition, and after general warrants had been declared unconstitutional in several cases, *see, e.g., Wilkes v. Wood,* 98 Eng.Rep. 489 (C.P. 1763),[4] the House of Commons eventually declared general warrants illegal and void for vagueness in 1766. Black's Law Dictionary 1585 (6th ed. 1990).

One of the most often cited reasons for opposition to general warrants was the recognition of a person's right to privacy within his own home. Indeed, in *Semayne's Case,* the court held that not even authorized specific warrants could be executed without giving the homeowner notice, *i.e.* without knocking before entering. Lord Coke explained that the sheriff, properly acting on behalf of the government (then the king), could not execute a specific warrant without notice to the homeowner because "the house of every one is to him as his ... castle...." 5 Co. Rep. 91a, 91b (K.B.1603). Thus, even when executing a specific warrant for the king, the sheriff was required to first "signify the cause of his coming, and ... make request to open doors." *Id.; see also Wilson v. Arkansas,* — U.S. —, —, 115 S.Ct. 1914, 1915, 131 L.Ed.2d 976 (1995) (tracing roots of

"knock-and-announce" rule to English common law and holding that the "'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment").

Moreover, in *Semayne's Case* the court also held that it was unlawful for a sheriff to execute a warrant contrary to a homeowner's wishes—even after knocking and announcing—when the sheriff was acting "at the suit" of a private citizen, rather than the government. 5 Co.Rep. at 92b ("it is not lawful for the Sher[iff] (on request made and denial) at the suit of a ... common person, to break the defendant's house ... to execute any process at the suit of any subject ..."). Thus, as early as 1603, it was established in the common law that intrinsic to the validity of the specific warrant was that it had to be executed by a properly commissioned officer to further the *government's purposes.* Even a duly authorized officer could not execute a warrant to further the purposes of a private individual. *See also Burdett v. Abbott,* 14 East 2, 156–57 (K.B.1811).

More than 100 years after the common law was apparently established in *Semayne's Case,* Great Britain, in exerting control over the colonies, enacted various general writs of assistance.[5] This legislation was one of the colonists' particular grievances against the mother country. James Otis' famous attack

---

*Mapp v. Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search–and–Seizure Cases, 83 Colum.L.Rev. 1365, 1368–71 (1983)).

**3.** Notwithstanding the widespread issuance of general warrants until the latter part of the 18th Century, an example of the movement to restrict the government's ability to conduct general searches can be found in a statute passed in 1360, during the reign of Edward III, which provided "'that all general inquiries before this time granted within any seignories, for the mischiefs and oppression which have been done to the people by such inquiries, shall utterly cease and be repealed.'" Lasson, *supra,* at 22 (quoting 34 Edw. III, Ch. 1 (1360)). This statute was one of the first concrete expressions by the English of their disdain for the general warrant. *Id.* at 20–21.

**4.** The notion of "unconstitutionality" in English common law can be traced to a theory advanced by Lord Coke, among others, that an "Ancient Constitution" existed in England. Morton J. Horwitz, *The Supreme Court, 1992 Term—Fore-*

*word: The Constitution of Change: Legal Fundamentality Without Fundamentalism,* 107 Harv. L.Rev. 30, 45 (1993). Lord Coke characterized the ancient constitution—which itself never appeared in written form but was at least partially embodied in the Magna Carta—as a fundamental restriction on the power of the monarch dating back to the beginning of time. *Id.*

**5.** A species of the general warrant, the writ of assistance granted nearly unrestricted permission to custom officials and private creditors alike to search for and seize, respectively, untaxed goods and goods in satisfaction of unpaid debts. *See Jenkins,* 619 N.E.2d at 330 n. 17; *Commonwealth v. Cundriff,* 382 Mass. 137, 415 N.E.2d 172, 176 (1980), *cert. denied,* 451 U.S. 973, 101 S.Ct. 2054, 68 L.Ed.2d 353 (1981); *see also* 2 Legal Papers of John Adams 107 (L.K. Wroth & H.B. Zobel eds., 1965). Moreover, once issued, writs of assistance were valid until six months after the death of the current monarch. *Jenkins,* 619 N.E.2d at 330 n. 18.

on these writs in *Lechmere's Case* invokes much of Lord Coke's language and many of his ideas. According to John Adams' 1761 abstract of Otis' argument, Otis asserted that general writs of assistance were illegal because:

In the first place the writ is universal, being directed "to all and singular justices, sheriffs, constables and *all other officers and subjects,* &c." So that in short *it is directed to every subject in the king's dominions; every one with this writ may be a tyrant: If this commission is legal, a tyrant may, in a legal manner also, controul, imprison or murder any one within the realm.*

In the next place, it is perpetual; there's no return, a man is accountable to no person for his doings, every man may reign secure in his petty tyranny, and spread terror and desolation around him, until the trump of the arch angel shall excite different emotions in his soul.

In the third place, a person with this writ, in the day time may enter all houses, shops, & c. at will, and command all to assist.

Fourth, by this not only deputies, &c. but even their menial servants are allowed to lord it over us—What is this but to have the curse of Canaan with a witness on us, to be the servant of servants, the most despicable of God's creation. *Now one of the most essential branches of English liberty, is the freedom of one's house. A man's house is his castle; and while he is quiet, he is as well guarded as a prince in his castle.* This writ, if it should be declared legal, would totally annihilate this privilege.

2 Legal Papers of John Adams, *supra,* at 134–144. (emphasis added). Otis went on to describe the tyranny that would result if warrants could be issued at the behest of an ordinary citizen, rather than the government:

What a scene does this open! Every *man prompted by revenge, ill humour or wantonness to inspect the inside of his neighbour's house, may get a writ of assistance;* others will ask it from self defence; one arbitrary exertion will provoke another,

until society will be involved in tumult and in blood.

*Id.* (emphasis added).

Thus, Otis, like Lord Coke before him, remonstrated against general warrants, *inter alia,* because they were not directed solely at authorized officers acting on behalf of the government but could be executed at the request of anyone and because they constituted an improper invasion—indeed, annihilation—of a person's cherished right to privacy, particularly in his own home. Otis' position was rejected by the Superior Court in *Lechmere's Case.* See *Jenkins,* 619 N.E.2d at 331; Lasson, *supra,* at 63. However, in the ensuing years, Otis' argument was accepted by the supreme courts of Pennsylvania and Virginia, *see* Tracey Maclin, *The Central Meaning of the Fourth Amendment,* 35 Wm. & Mary L.Rev. 197, 225–26 (1993), and by the First Congress when in 1789 it adopted the Fourth Amendment. Thus, when the Framers recognized the "right of the people to be secure in their ... houses" from "unreasonable searches" and mandated that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the things to be seized," they rejected general warrants with all the pitfalls outlined by Otis—and Lord Coke—including issuance of a warrant at the suit of a private citizen. Moreover, as Justice O'Connor recently noted, although "the Fourth Amendment, in the Warrant Clause, prohibits by name only searches by general warrants .... this was only because the abuses of the general warrant were particularly vivid in the minds of the Framers' generation, ... and not because the Framers viewed other kinds of general searches as any less unreasonable." *Vernonia Sch. Dist. 47J v. Acton,* — U.S. ——, ——, 115 S.Ct. 2386, 2399, 132 L.Ed.2d 564 (1995) (O'Connor, J., dissenting) (citation omitted). In fact, " '[p]rohibition of the general warrant was part of a larger scheme to extinguish general searches categorically.' " *Id.* (quoting William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning 1499 (1990) (Ph.D. Dissertation, Claremont Graduate School)).

The Supreme Court has never abrogated the requirement of a specific warrant. Thus, it is well established that, absent a recognized exception to the warrant requirement, a search may not encompass items not specified within a warrant. *See Bivens*, 403 U.S. at 394 n. 7, 91 S.Ct. at 2004 n. 7 ("the Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant ..."); *see also United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988) ("[w]hen law enforcement officers grossly exceed the scope of a search warrant ..., the particularity requirement is undermined and a valid warrant is transformed into a[n invalid] general warrant"); *Creamer v. Porter*, 754 F.2d 1311, 1319 (5th Cir.1985) ("[a] reasonable officer would be aware ... [of] the rule confining the search to items particularly described in the warrant"). Nor is there any question that those conducting the search may only actively search for the items listed in the warrant. *See, e.g., Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976); *United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir.1986). Furthermore, " '[p]olice with a warrant for [illegal weapons] may search only where [illegal weapons] might be and must terminate the search once the [illegal weapons are] found.' " *Horton v. California*, 496 U.S. 128, 141, 110 S.Ct. 2301, 2310, 110 L.Ed.2d 112 (1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 517, 91 S.Ct. 2022, 2063, 29 L.Ed.2d 564 (1971) (White, J., concurring and dissenting)).

Similarly, the special protection to be afforded a person's right to privacy within his own home has also been continuously and consistently recognized by the Court. The right to "sanctity of private dwellings," has been held to be the right "ordinarily afforded the most stringent Fourth Amendment protection." *United States v. Martinez–Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976); *see also Winston v. Lee*, 470 U.S. 753, 761–62, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985); *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (" 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed' " (quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972))). Indeed, the Court has repeatedly recognized that protection from such intrusions is the primary focus of the Fourth Amendment. *See, e.g., Soldal v. Cook County, Ill.*, —— U.S. ——, ——, 113 S.Ct. 538, 543, 121 L.Ed.2d 450 (1992); *Payton*, 445 U.S. at 586 n. 24, 100 S.Ct. at 1380 n. 24; *see also United States v. Bellina*, 665 F.2d 1335, 1340 (4th Cir.1981).

In view of the "common law at the time of the framing," of the Fourth Amendment, *Wilson*, —— U.S. at ——, 115 S.Ct. at 1916,[6] and the Supreme Court's uniform interpretation of the Amendment's protections since that time, we have no doubt that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant. Such a search is not "reasonable." It obviously exceeds the scope of the required specific warrant and furthermore violates the "sanctity of private dwellings." *Martinez–Fuerte*, 428 U.S. at 561, 96 S.Ct. at 3084.

Accordingly, Buonocore has alleged the violation of a right protected by the Fourth Amendment. We would so hold even if there were no reported opinion directly on point.[7] This is so because there is no re-

---

6. Although we believe that in this case examination of the "common law at the time of the framing" is helpful, we do not suggest that it provides the measure or definition of law enforcement practices permissible today under the Fourth Amendment. *See* Maclin, *supra*, at 211–16.

7. Indeed, the only other courts of appeals to consider similar questions have held the right alleged by Buonocore was clearly established, even though at the time of the searches ad-

dressed in those cases, there were no reported opinions directly on point so holding. *See Ayeni v. Mottola*, 35 F.3d 680, 686 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995); *Bills v. Aseltine*, 958 F.2d 697 (6th Cir.1992) (discussed *infra*). *Ayeni* involved a search conducted prior to that of Buonocore's home, but the Second Circuit's opinion was not published until after the Buonocore search. Although such case law is "not directly relevant to the question" of whether the right alleged by Buonocore is clearly established, it is,

quirement that the "exact right allegedly violated" be previously "specifically recognized by a court" in order for it be held " 'clearly established' for qualified immunity purposes." *Pritchett,* 973 F.2d at 314; *see also Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. Rather, " '[c]learly established' in this context includes not only specifically adjudicated rights but those manifestly included within more general applications of the core constitutional principle invoked." *Id.* The right to be free from government officials facilitating a private person's general search of the sort Buonocore alleges was conducted here, is "manifestly included" within "core" Fourth Amendment protection. To paraphrase Judge Posner's recent observation when rejecting a claim of qualified immunity in another context, "the absence of [many] reported case[s] with similar facts demonstrates nothing more than wide-spread compliance with well-recognized constitutional principles." *Eberhardt v. O'Malley,* 17 F.3d 1023, 1028 (7th Cir.1994).

Tellingly, Harris and Cundiff do not offer any significant argument to the contrary. They do broadly assert that they are entitled to qualified immunity because the right "*allegedly* violated" was not "clearly established." Appellants' Brief at 20 (emphasis added). However, the principal focus of their argument is directed not to the facts *alleged* by Buonocore, but to those asserted by Cundiff and C & P employee, Thompson. Thus, they maintain that the telephone equipment was discovered by the officers in the course of their lawful search of Buonocore's home and that Thompson's sole role was to assist the officers in that lawful search. For this reason, the officers claim that Thompson's presence in and search of Buonocore's home was authorized by 18 U.S.C. § 3105 (1988). Specifically, Harris and Cundiff assert that § 3105 establishes

that "a federal law enforcement officer is authorized to bring with him [in conducting an authorized search] a private citizen *to assist him* in recognizing evidence of a crime, including evidence the officer suspects may be encountered in 'plain view,' [8] but which is not listed on the warrant." Appellants' Brief at 5 (emphasis added).

Regardless of the accuracy of the latter statement, it provides no assistance to the officers here. The fundamental difficulty with this statement and the officers' argument is that in determining whether a right is "clearly established" a court examines the facts alleged *by the plaintiff,* not those asserted by the defendant. *See Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815 (*"plaintiff's allegations"* must "state a claim of violation of clearly established law" (emphasis added)); *DiMeglio,* 45 F.3d at 794. Here Buonocore has alleged that government officials—Harris and Cundiff—by obtaining a search warrant, facilitated a C & P employee's search of Buonocore's home, that this search was directed at items not listed in the warrant, and that it was conducted totally independently from the search authorized in the warrant. Of course, Buonocore may not be able to prove these allegations, but the defendants cannot demonstrate that Buonocore's allegations do not state a violation of a clearly established right simply by substituting their own version of the facts.

Lest there be any doubt, it is clear that the principle enunciated in the statute upon which Harris and Cundiff rely, 18 U.S.C. § 3105, provides no defense for them to Buonocore's *allegations.* Section 3105 provides:

> A *search warrant may* in all cases *be served by any of the officers* mentioned in its direction or by an officer authorized by law to serve such warrant, *but by no other*

---

of course, "an indication" of the Second Circuit's view of a contemporaneous search. *See Torcasio,* 57 F.3d at 1349 n. 7.

**8.** The suggestion by Harris and Cundiff that the "plain view" doctrine is somehow relevant to this case is puzzling. In fact, the "plain view" doctrine has no applicability here since Buonocore's claim is based on an allegedly illegal

search of his home, not a *seizure* of property. *See Horton,* 496 U.S. at 136, 110 S.Ct. at 2307. Moreover, it is not at all clear that a seizure of the C & P equipment would have been authorized under the "plain view" doctrine; for example, it is disputed whether the "incriminating character" of the telephone equipment was "immediately apparent." *Id.* Nonetheless, that question is entirely academic since no telephone equipment was ever seized.

*person, except in aid of the officer* on his requiring it, he being present and acting in its execution.

18 U.S.C. § 3105 (emphasis added). Thus, in order to come within the scope of § 3105, a person who is not authorized by warrant to search must be acting, not for an independent purpose as Buonocore alleges Thompson did here, but "in aid of" an officer who has been authorized by warrant to search. Section 3105 specifically provides as much, permitting authorized officers and those acting "in aid" of them to search, but allowing "no other person" to do so. Furthermore, in every case holding that private individuals were permitted by § 3105 to search, these individuals were assisting or acting "in aid of" an officer conducting a search authorized by warrant. *See, e.g., United States v. Robertson*, 21 F.3d 1030, 1034 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 238, 130 L.Ed.2d 161 (1994); *United States v. Clouston*, 623 F.2d 485, 486–87 (6th Cir.1980) (*per curiam*); *United States v. Schwimmer*, 692 F.Supp. 119, 126–27 (E.D.N.Y.1988); *see also Martin*, 600 F.2d at 1182 ("under federal law a search warrant may be executed by (1) the person to whom the warrant is directed; (2) any officer authorized by law to execute such warrants; or (3) some other person aiding a person under (1) or (2) who is present and acting in the execution of the warrant. Furthermore, execution by an unauthorized person would render the search illegal" (footnote omitted)).

The importance of the "in aid of" requirement is best illustrated by examination of two otherwise similar cases from the same circuit in which the "in aid of" requirement provides the most important distinction. In *United States v. Clouston*, the Sixth Circuit held that items obtained by federal agents in executing a search warrant for "electronic devices" used in the interception of wire communications need not be suppressed although telephone company employees had accompanied the agents "in the execution of the warrant in order to identify any property of the telephone company which might be found on the premises during the search." 623 F.2d at 486. This was so because the telephone company employees were "on the premises *in aid of* the officers" who "were

present and acting in execution of the warrant." *Id.* at 486–87 (emphasis added). In its very short *per curiam* opinion, the court twice noted the uncontroverted testimony that the *sole* "role" of the telephone company employees was to identify (not search for) telephone company equipment. *Id.* at 487. Indeed, one of the telephone company employees in *Clouston* "testified that he was assigned to one of the agents and told to stay with him at all times" during the search and "that his only role was to identify telephone company equipment." *Id.* at 486.

Twelve years later, in *Bills v. Aseltine*, the Sixth Circuit considered a similar situation. There, after obtaining a warrant to search a private residence for a stolen Kubota generator, a local police sergeant invited a General Motors (GM) employee to accompany him on the search to identify any stolen GM property. 958 F.2d 697, 700 (6th Cir.1992). After the generator was recovered, the GM employee arrived at the house and, together with the police officers, searched for GM equipment. The homeowner brought suit against the sergeant asserting that he had violated her Fourth Amendment rights to be free from unlawful searches by permitting a private person—the GM employee—to conduct an independent and unauthorized search for items not listed in the warrant. Relying on *Clouston*, the district court granted summary judgment to the sergeant on qualified immunity grounds.

The Sixth Circuit reversed, holding that the district court's finding of qualified immunity on the basis of *Clouston* was error. First, the appellate court in *Bills* noted that, unlike the *Clouston* search, the *Bills* search was executed pursuant to a state warrant, and so § 3105 was not directly applicable. However, although unnecessary to its ultimate holding, the *Bills* court went on to discuss at greater length another reason why the district court's reliance on *Clouston* was "misplaced." The Sixth Circuit explained that while in *Clouston*, it had "found it to be 'clear that the telephone company employees were present on the premises *in aid of the officers*,'" *Bills*, 958 F.2d at 702 (*quoting Clouston*, 623 F.2d at 485 (emphasis in *Bills*)), in *Bills* the GM employee "was pres-

ent, not in aid of the [police] officers or their mission, but for his own purposes involving the recovery of stolen General Motors property not mentioned in any warrant" and "the execution" of the warrant was "complete" by the time the GM employee arrived. *Id.* at 702. The *Bills* court therefore concluded that because a warrant cannot "implicitly authorize" government officers "to invite a private [individual] to tour plaintiff's home" for a mission unrelated to the search authorized by warrant, the sergeant in *Bills* was not entitled to summary judgment on qualified immunity grounds. *Id.* at 704–705.

 Here, as in *Bills,* a homeowner (in this case Buonocore) has alleged that law enforcement officers brought into his home a private person who was not assisting the officers in conducting an authorized search, but was on his own mission to recover property not mentioned in any warrant. Although Buonocore does not assert that the private search began after the official search was complete, he does assert that it was carried on entirely independently of the official search and in areas not searched by law enforcement officers. In sum, Buonocore, like the homeowner in *Bills,* has *alleged* a violation of his Fourth Amendment rights by government agents and so, as in *Bills,* § 3105 provides the agents no defense to these allegations. To conclude otherwise would authorize law enforcement officers to invite private individuals to engage in conduct that would constitute trespass were it not conducted under the guise of a search warrant. Neither the Fourth Amendment nor § 3105 grants government agents such authority. *See United States v. Van Dyke,* 643 F.2d 992, 993 (4th Cir.1981) ("absent exigent circumstances, a warrantless search of one's home or its curtilage, when effected through trespass, violates the fourth amendment").

### IV.

Of course, Harris and Cundiff deny Buonocore's allegations. The district court accordingly found that there was a material factual dispute over what the defendants actually did that prevented the grant of summary judgment in favor of Harris and Cundiff. As to Harris, the court reasoned:

> There is a triable issue of fact about the reasonableness of the search of Buonocore's residence.... A search warrant circumscribes the right to search. If the search exceeds the scope of the search warrant then the search becomes unreasonable. The invitation to the C & P employee to enter Buonocore's residence to search for C & P equipment and the resulting search by James Thompson, according to Buonocore's affidavit, exceeded the scope of the search warrant.

Similarly, as to Cundiff, the court concluded:

> As noted above ..., there is a triable question as to whether the scope of the search was reasonable, i.e. whether defendant Thompson's search of plaintiff's property polluted the reasonableness of the search. Because Cundiff was acting pursuant to federal authority, he took on the rights and obligations of a federal officer.

(Footnotes omitted.)

 Unlike the determination of whether a right is clearly established, which is a question of law, *Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793, the determination of what an officer did may require the resolution of disputed factual allegations by the trier of fact. *Anderson,* 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6; *Pritchett,* 973 F.2d at 312–13; *see also Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir.1993) ("Rule 56 still has vitality in qualified immunity cases if the underlying historical facts in dispute ... are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994). Disputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context. *Pritchett,* 973 F.2d at 313 (the rules governing summary judgment are not to be "skewed from [their] ordinary operation to give special substantive favor to the defense ..."). If a plaintiff has alleged a clearly established right, summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the

defendants. *Id.*; *see also Mitchell*, 472 U.S. at 526–527, 105 S.Ct. at 2815–2816; *DiMeglio*, 45 F.3d at 795; *ACLU of Md., Inc. v. Wicomico County, Md.*, 999 F.2d 780, 784 (4th Cir.1993) (if "the defendant's entitlement to immunity turns on a factual dispute, that dispute is resolved by the jury at trial").

█ Until recently, at this juncture we would have, pursuant to circuit precedent, *see Turner v. Dammon*, 848 F.2d 440, 444 (4th Cir.1988), proceeded to determine whether the district court was correct in holding that there was a "triable issue of fact about the reasonableness of the search of Buonocore's residence." However, the Supreme Court recently held:

> a defendant, entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial.

*Johnson v. Jones*, —— U.S. ——, ——, 115 S.Ct. 2151, 2159, 132 L.Ed.2d 238 (1995).

In *Jones*, Justice Breyer, for a unanimous Court, explained that the exception to the general rule that interlocutory orders are not immediately appealable—fashioned in *Mitchell*—for orders denying officials qualified immunity prior to trial, did not extend to such orders when they "resolved a *fact*-related dispute." *Jones*, —— U.S. at ——, 115 S.Ct. at 2153 (emphasis in original). In *Mitchell*, the Court held that "a district court's order denying a defendant's motion for summary judgment was an immediately appealable 'collateral order' ... under *Cohen* [*v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949)], where (1) the defendant was a public official asserting a defense of 'qualified immunity,' and (2) the issue appealed concerned ... whether or not certain given facts showed a violation of 'clearly established' law." *Jones*, —— U.S. at ——, 115 S.Ct. at 2155 (quoting *Mitchell*, 472 U.S. at 528, 105 S.Ct. at 2816). Although, as the *Jones* Court acknowledged, "some language" in *Mitchell* "sounds as if it might imply" that all qualified immunity denials are immediately appealable, the *Mitchell* Court did not so hold. *Jones*, —— U.S. at ——, 115 S.Ct. at 2156. Rather, *Mitchell*

"emphasize[d] ... that the [immediately] appealable issue is a purely legal one: whether the facts alleged ... support a claim of violation of clearly established law." *Mitchell*, 472 U.S. at 528 n. 9, 105 S.Ct. at 2816 n. 9; *see also id.* at 530, 105 S.Ct. at 2817 ("a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law*, is an appealable 'final decision' ...." (emphasis added)).

In addition to the fact that it found that *Mitchell* itself provided no precedent for extension of its appealability rule to the resolution of a "fact-related" qualified immunity dispute, the *Jones* Court concluded that this extension was unwarranted for two other reasons. First, because such "fact-related" questions involve issues not "significantly different from the fact-related legal issues that likely underlie plaintiff's claim on the merits" permitting an immediate appeal of them would be contrary to the *Cohen* "separability" requirement, *i.e.* appealable collateral orders must " 'resolve an important issue completely separate from the merits of the action.' " *Jones*, —— U.S. at ——, ——, 115 S.Ct. at 2157, 2155 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978)). Moreover, "considerations of delay, comparative expertise of trial and appellate courts, and wise use of appellate resources," were found to "argue in favor of limiting interlocutory appeals of 'qualified immunity' matters to cases presenting more abstract issues of law." *Id.*, —— U.S. at ——, 115 S.Ct. at 2158. The *Jones* Court expressly recognized that, like a determination as to clearly established law, a "fact-related" qualified immunity determination "forces public officials to trial" and so, to some extent, the *Jones* holding undercuts the policy of "protecting public officials" not just from liability, but also from standing trial—a policy consideration regarded as very important in *Mitchell*, 472 U.S. at 525–27, 105 S.Ct. at 2814–16, and *Harlow*, 457 U.S. at 817–18, 102 S.Ct. at 2738. *See Jones*, —— U.S. at ——, 115 S.Ct. at 2158. Nevertheless, the *Jones* Court concluded that "the countervailing considerations" of "precedent, fidelity to statute, and underly-

ing policies" were "too strong to permit the extension of *Mitchell* ...." *Id.*

In sum, *Jones* unequivocally holds that an order denying summary judgment on qualified immunity grounds insofar as it determines whether the "pretrial record sets forth a 'genuine' issue of fact" is not immediately appealable. *Id.,* — U.S. at —, 115 S.Ct. at 2159. For this reason, we must dismiss the appeals.[9]

*DISMISSED.*

---

9. The *Jones* Court made it clear that appellate jurisdiction over the question of whether a defendant violated clearly established rights of which a reasonable person would have known should not be regarded as a basis for exercising pendent jurisdiction over fact-related qualified immunity questions. *Id.,* — U.S. at —, 115 S.Ct. at 2159.