Leonard **EDMUNDSON** et al., Plaintiffs,

v.

Grayham **KEESLER** et al., Defendants.

No. 5:94–CV–467–BO(3).

United States District Court,
E.D. North Carolina,
Raleigh Division.

Nov. 2, 1995.

James K. Dorsett, III, Steven M. Sartorio, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, Raleigh, NC, for plaintiffs.

Kenneth R. Wooten, Cheryl A. Marteney, Ward & Smith, New Bern, NC, for defendants.

### ORDER

TERRENCE WILLIAM BOYLE, District Judge.

This matter is before the undersigned on defendants' motion for partial summary judgment on the grounds of qualified immunity. The issue is whether defendant officers acted reasonably in using lethal force to serve an arrest warrant on a fleeing suspect. Finding a genuine issue of material fact necessary to the determination of the reasonableness of the officers' actions, the court denies defendants' motion for partial summary judgment.

On July 2, 1992, defendant officers Grayham Keesler and Daniel Peters traveled to the Franklin Baking Company in Goldsboro, North Carolina to serve an arrest warrant on Ricky Turnage, an employee of Franklin. The warrant authorized the arrest of Turnage for selling 6.8 grams of marijuana five months earlier. When the defendant officers confronted Turnage, he asked if he could finish unloading his delivery truck. The officers acceded to his request. Some twenty to forty minutes later while the officers were conversing with Turnage's supervisors, Turnage ran out of the warehouse and into the parking lot in which his personal truck was parked. The officers followed. The parties' accounts of the events in the parking lot differ dramatically. In general terms, defendants argue that Turnage was in the process of running over Officer Keesler when the officers shot Turnage to death. Plaintiffs, on the other hand, allege that neither Keesler nor Peters was in danger of serious bodily harm. The evidence supporting each party's version is discussed below.

Defendants Keesler, Peters, Morgan, and Hill move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that the doctrine of qualified immunity shields them from liability in this case. In order to grant a motion for summary judgment, the court must determine, in the light most favorable to the non-moving party, that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Under Rule 56, a party may move with or without supporting affidavit. Fed.R.Civ.P. 56(a). When a motion is made and supported, the non-moving party must set forth specific facts showing there is a genuine issue for trial in order to avoid summary judgment for the moving party if otherwise appropriate. Fed.R.Civ.P. 56(e); *see Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the instant case both parties have submitted affidavits in support of their arguments on the motion for partial summary judgment.

A court's analysis of the underlying facts on a motion for summary judgment on the grounds of qualified immunity should proceed no differently than in any other context. *Buonocore v. Harris,* 65 F.3d 347, 359 (4th Cir.1995). If a plaintiff has alleged a clearly established right, summary judgment is improper as long as there remains any genuine issue of material fact regarding the actual conduct of the defendants. *Id.* at 359–60. A genuine issue of material fact exists if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In deciding whether an official is entitled to qualified immunity, the court must (1) identify the specific constitutional right allegedly violated, (2) determine whether that right was clearly established at the time of the alleged violation, and (3) determine whether a reasonable person in the official's position would have known that his conduct would violate that right. *Collinson v. Gott,* 895 F.2d 994, 998 (4th Cir.1990) (Phillips, J., concurring). The first and second of these inquiries are pure questions of law for the court, but the third, which is also a question of law, may sometimes require factual determinations pertaining to the conduct of a defendant and the attendant circumstances. *Id.*

Plaintiffs have alleged that defendants deprived Turnage of his Fourth and Fourteenth Amendment rights to be free from unreasonable seizure. Specifically, plaintiffs aver that Officers Keesler and Peters used unconstitutionally excessive and lethal force in their attempt to arrest Turnage. Having identified the specific constitutional right allegedly violated, the court must ascertain whether the right was so clearly established as to put a reasonable defendant on notice that his conduct violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Collinson,* 895 F.2d at 998. In *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the United States Supreme Court held that the use of deadly force to prevent the escape of an apparently unarmed suspected felon is unconstitutional unless such force "is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. at 1697; *see Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir.1991). Additionally, it is undisputed that Keesler and Peters were aware of this limitation on the use of deadly force from the training they had received as officers. Hill Aff. ¶ 8; Morgan Aff. ¶¶ 3, 4, 8. Thus, the court concludes that reasonable officers would be aware of the general right allegedly violated.

The final determination required of the court is whether a reasonable officer would have known that his conduct violated Turnage's rights. A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40. In evaluating the factual context, the reasonableness standard requires a court to focus on the circumstances as they appeared to exist at the time the events were unfolding, affording interpretive latitude to official judgments. *Gooden v. Howard County,* 954 F.2d 960, 965 (4th Cir. 1992); *Torchinsky v. Siwinski,* 942 F.2d 257, 261 (4th Cir.1991).

Accordingly, if a reasonable officer in the position of Keesler could have found probable cause to believe that Turnage posed a serious threat of personal bodily harm at the time Keesler shot Turnage, then as a matter of law, Keesler is entitled to qualified immunity. Similarly, if a reasonable officer in the position of Peters could have found probable cause to believe that Turnage posed a serious threat of bodily harm to Keesler at the time Peters shot Turnage, then Peters is entitled to qualified immunity as a matter of law. Both inquiries, however, require the court to analyze the facts surrounding the relative positions and movements of Turnage, Peters, and Keesler.

According to the affidavits given by Officers Keesler and Peters, they chased Turnage as he fled from the bakery warehouse demanding that he stop. Keesler Aff. ¶ 27;

Peters Aff. ¶ 12. Ignoring the officers' demands, Turnage jumped into his truck, started the engine, and backed the truck in a clockwise direction, nearly hitting Peters who stood behind the truck with his pistol drawn. Keesler Aff. ¶¶ 31, 32; Peters Aff. ¶ 13. By the time the truck stopped, Peters had moved to a position near the driver's side door. Keesler Aff. ¶ 33; Peters Aff. ¶ 13. Meanwhile, Keesler stood in front of the truck on the passenger's side. Keesler Aff. ¶ 33; Peters Aff. ¶ 14.

At this point defendants contend that Turnage raced the engine, turned the steering wheel to the right, and accelerated in disregard of warnings being yelled by the officers. Keesler Aff. ¶ 34; Peters Aff. ¶ 14. Turnage's truck then struck Keesler. Keesler Aff. ¶ 35. Standing with his left hand and chest against the hood, Keesler pointed his gun at Turnage. Keesler Aff. ¶ 35; Peters Aff. ¶ 15. While trying to retreat, Keesler fired one shot through the windshield at Turnage. Keesler Aff. ¶ 36. Officer Peters then fired two shots through the driver's side window at Turnage. Peters Aff. ¶ 15. After the shots, the truck proceeded into the street, halting after it hit a guy wire of a utility pole. Keesler Aff. ¶ 41; Peters Aff. ¶¶ 17, 19. Turnage was dead by the time the officers reached the truck. Keesler Aff. ¶ 44; Peters Aff. ¶ 20.

Observations by two witnesses support the account of the officers. The proprietor of the bakery and a delivery person observed Keesler standing in front of Turnage's truck with his left hand on the hood as Turnage drove forward. Stewart Aff. ¶ 4; Franklin Aff. ¶ 4. The witnesses saw Keesler fire his weapon only after Turnage drove in Keesler's direction. Stewart Aff. ¶ 4; Franklin Aff. ¶ 4. The proprietor also witnessed a police officer standing on the driver's side of the truck as it moved forward. Franklin Aff. ¶ 5.

In addition to the eye-witness accounts, affidavits by two experts based upon the physical evidence collected at the scene corroborate the stories of the officers. The ballistics reports and the autopsy reveal that Keesler fired his gun once while positioned in front of the truck to the passenger's side of the center of the truck. Ross Aff. ¶ 18;

Matthews Aff. ¶¶ 10, 16. The bullet passed through the windshield, through Turnage's chin, and into Turnage's chest. Ross Aff. ¶ 18; Matthews Aff. ¶¶ 10, 16. Keesler's palm prints were found on the hood of Turnage's truck in a position consistent with where Keesler would have had to have stood in order to have fired the bullet which traveled through the windshield. Ross Aff. ¶ 19; Matthews Aff. ¶ 15. The ballistics reports also show that Peters fired one shot from a position just slightly in front of the driver's side door and a second shot from beside the driver's side door. Ross Aff. ¶ 20; *see* Matthews Aff. ¶¶ 11, 12, 16. One bullet struck Turnage's chest, lodging in his heart, and the other traveled through his arm. Ross Aff. ¶ 20; Matthews Aff. ¶¶ 11, 12. Additionally, tire impressions in the gravel parking lot indicate that the truck accelerated rapidly. *Id.* ¶ 21.

Plaintiffs rebut defendants' account of the incident with affidavits from Turnage's supervisors who also witnessed the incident. According to Lionel Ginn and William Scott Tyson, after Turnage jumped in his truck he drove a short distance forward up an embankment where Keesler stood with his gun drawn. Ginn Aff. ¶ 8. Keesler pounded on the truck's hood yelling at Turnage to stop. Ginn Aff. ¶ 8. Turnage then stopped and backed out of his parking space in a semicircular manner positioning his truck so that it pointed in the direction of the parking lot gate leading to the public street. Ginn Aff. ¶ 8; Tyson Aff. 7. Keesler followed the truck placing himself two to four feet from the front corner on the driver's side. Ginn Aff. ¶ 8; Tyson Aff. ¶ 7. Turnage then began to drive forward and to the right, away from Officer Keesler. Ginn Aff. ¶ 8; Tyson Aff. ¶ 7. Keesler fired his gun toward Turnage and then ran beside the truck shooting again into the driver's side window. Ginn Aff. ¶ 8; Tyson Aff. ¶ 7. The affiants did not see the position of Officer Peters, but swear that he was neither behind the truck nor in danger of being hit by the truck. Ginn Aff. ¶ 9; Tyson Aff. ¶ 10.

■ The affidavits submitted by the parties reveal two very different versions of the events leading to the death of Turnage. Defendants' account of the incident provides a factual basis upon which the court could con-

clude as a matter of law that the officers acted in accordance with constitutional standards in their use of lethal force. Because the doctrine of qualified immunity requires only that the officers act reasonably in response to the information they possess regarding the surrounding circumstances, *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40; *Slattery*, 939 F.2d at 216, defendants' evidence that Officer Keesler was in danger of being run over by Turnage would provide a basis for a finding of qualified immunity. Defendants' account of the events is not, however, undisputed. The affidavits of two eye-witnesses, submitted by plaintiffs, directly contravene defendants' version of the events. Specifically, plaintiffs' witnesses, who observed the entire incident, swear that Keesler stood to the driver's side of the truck as Turnage accelerated forward and to the passenger's side. Such evidence would permit this court to hold that reasonable officers would have known that the use of lethal force was unconstitutional, thereby depriving defendant officers of the defense of qualified immunity.

The court finds that the submission by plaintiffs of the affidavits of two eye-witnesses is sufficient to create a genuine issue of material fact critical to the legal determination of whether reasonable officers would have known that their actions were unconstitutional. It is of no consequence that defendants have submitted what they believe to be conclusive physical and forensic evidence in support of their version of the facts. The existence of such evidence does not automatically render contradictory eye-witness testimony worthless. Instead, the value of that evidence, as well as of that submitted by plaintiffs, turns on an assessment of credibility that only a jury can make. The court therefore holds that a reasonable jury could find the facts as alleged by plaintiffs, thereby necessitating a trial as to the facts underlying the officers' use of lethal force.

Accordingly, defendants' motion for partial summary judgment on the grounds of qualified immunity is DENIED.